Tino **VILLANUEVA**, Plaintiff, Appellant,

v.

**WELLESLEY COLLEGE**, Defendant, Appellee.

No. 90–1898.

United States Court of Appeals, First Circuit.

Heard Feb. 5, 1991.

Decided April 19, 1991.

Jonathan Shapiro, with whom Stern & Shapiro, Boston, Mass., was on brief for plaintiff, appellant.

John H. Mason, with whom Philip C. Curtis and Ropes & Gray, Boston, Mass., were on brief for defendant, appellee.

Before BREYER, Chief Judge, CAMPBELL and TORRUELLA, Circuit Judges.

**TORRUELLA, Circuit Judge.**

This appeal presents an intersection of three areas of law: the summary judgment standard; the burden-shifting analysis in employment discrimination cases; and the special considerations relevant to employment discrimination in the milieu of academic tenure decisions. Our negotiation of this junction leads us to affirm the grant of summary judgment in favor of defendant-appellee Wellesley College.

## BACKGROUND

Tino Villanueva, a poet and a specialist in Chicano [1] literature, joined the Wellesley faculty in 1974 as a part-time instructor in the Spanish Department. After completing the requirements for a Ph.D. in 1981, he was promoted to a full-time, tenure-track assistant professorship. In 1985 he became eligible for tenure. The Spanish Department Reappointment & Promotions Committee ("R & P Committee"), comprising the tenured members of the department, recommended against granting Villanueva tenure by a vote of three to one, with only the department chair dissenting. The Committee on Faculty Appointments ("CFA"), composed of representatives from the entire college and responsible for final tenure decisions, voted to accept the R & P Committee's recommendation and, upon Villanueva's request for reconsideration, again voted against tenure. In accordance with its usual procedure when tenure has been denied, Wellesley terminated Villanueva's employment effective at the end of a one-year terminal appointment.

Villanueva filed charges with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD") alleging that Wellesley had denied him tenure and terminated his employment on account of his race, color, national origin, sex and age. The EEOC informed Villanueva that it found no reasonable cause to believe that his allegations were true and that he

---

1. The term "Chicano" refers to Mexican-Americans and their culture. It is thought to derive from either a Mexican Spanish dialectal pronunciation of "Mexicano," or from a combination of the words "Chihuahua" and "Mexicano." *See The Barnhart Dictionary of Etymology* (1988); 2 *Encyclopaedia Britannica Micropaedia* (1984).

had a right to commence suit; the MCAD also issued a lack of probable cause finding.

This action followed. Villanueva's amended complaint stated violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.;* and the employment discrimination provisions of Massachusetts law, Mass.Gen.L. ch. 151B, §§ 4(1) and (1B).[2] After completion of discovery, Wellesley filed motions for summary judgment on all claims. The case was referred to a magistrate who, in a comprehensive written opinion, recommended that the court grant Wellesley's motions for summary judgment. The district court agreed and entered judgment for Wellesley. Villanueva appealed.

### THE LEGAL STANDARDS

■ Summary judgment is to be:
rendered forthwith if the pleadings, depositions, answers or interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56. We exercise plenary review of summary judgment. *Olivera v. Nestlé Puerto Rico, Inc.,* 922 F.2d 43, 45 (1st Cir.1990). In so doing, we view all the facts in the light most favorable to the non-moving party and indulge all inferences advantageous to that party, provided they arise reasonably from the record. *Id.*

The three-step burden-shifting analysis used in the majority of differential treatment employment discrimination cases is by now so familiar that it need not be fully explored here. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d

207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *see also Olivera,* 922 F.2d at 46–47 (summarizing Supreme Court employment discrimination doctrine). In cases where there is no direct evidence of discrimination, once the plaintiff has raised an inference of discrimination (the *McDonnell Douglas* prima facie case) the burden shifts to the defendant to articulate a nondiscriminatory justification for its decision; and when that burden is met, the plaintiff must produce evidence that the defendant's reasons "were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Importantly, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

■ As the first two elements of the *McDonnell Douglas* model are quite easy to meet, it is not surprising that most cases, like this one, come to rest on the third step. At the summary judgment stage, "when, as here, the employer has articulated a presumptively legitimate reason for discharging an employee, the latter must elucidate specific facts which would enable a jury to find that the reason given was not only a sham, but a sham intended to cover up the employer's real motive: ... discrimination." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 9 (1st Cir.1990); *see also Menzel v. Western Auto Supply Co.,* 848 F.2d 327, 329–30 (1st Cir. 1988); *Menard v. First Security Services Corp.,* 848 F.2d 281, 287 (1st Cir.1988); *Dea v. Look,* 810 F.2d 12, 15–16 (1st Cir. 1987); *Kumar v. Board of Trustees, Univ. of Mass.,* 774 F.2d 1, 14 (1st Cir.1985) (Campbell, J., concurring), *cert. denied,* 475 U.S. 1097, 106 S.Ct. 1496, 89 L.Ed.2d 896 (1986). The plaintiff must do more than cast doubt on the wisdom of the employer's

---

**2.** We do not distinguish further among the various statutes, as the standards of liability under all are substantially identical. *See Banerjee v. Board of Trustees of Smith College,* 648 F.2d 61, 62 n. 1 (1st Cir.) (Title VII and § 1981 create similar rights in cases of employment discrimination), *cert. denied,* 454 U.S. 1098, 102 S.Ct.

671, 70 L.Ed.2d 639 (1981); *Loeb v. Textron,* 600 F.2d 1003, 1015 (1st Cir.1979) (Title VII standards apply to age discrimination action); *McKenzie v. Brigham & Women's Hosp.,* 405 Mass. 432, 541 N.E.2d 325, 327 (1989) (Massachusetts applies Title VII standards to its own anti-discrimination statute).

justification; to defeat summary judgment, the plaintiff must introduce evidence that the real reason for the employer's action was discrimination. *Medina–Muñoz,* 896 F.2d at 9; *Menard,* 848 F.2d at 287.

This requirement does not place a burden on the plaintiff in addition to that outlined in *McDonnell Douglas. Cf. Connell v. Bank of Boston,* 924 F.2d 1169, 1182 (1st Cir.1991) (Bownes, J., dissenting) (suggesting that this circuit has added to the plaintiff's burden). Rather, the requirement springs from the mandate of Rule 56. Rule 56 requires the non-moving party to demonstrate the existence of a dispute of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). In order to create a dispute of material fact, a discrimination plaintiff must raise an inference of discriminatory motive underlying the pretextual explanation. *Medina–Muñoz,* 896 F.2d at 9. Nondiscriminatory motive is immaterial to a discrimination case; therefore, the mere showing that the employer's articulated reason may shield another (possibly nondiscriminatory) reason does not create a dispute of material fact. Only if there is evidence from which a reasonable inference of discrimination can be drawn has the plaintiff defeated the summary judgment motion.

■ It was suggested at oral argument in this case that a mechanical application of the *McDonnell Douglas* framework was the correct one. Under that analysis, once a plaintiff has produced evidence of pretext, the employer's justification vanishes and the original *McDonnell Douglas* inference of discrimination rises again, automatically overcoming summary judgment. We reject that formalistic approach as not in keeping with either Supreme Court doctrine or common sense. *See Furnco Constr. Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (the *McDonnell Douglas* model "was not intended to be rigid, mechanized or ritualistic."). Depending on the facts and circumstances of each case, the original prima facie case plus the evidence of pretext may

suffice to raise an inference of discrimination, or additional evidence may be required. There is no absolute rule that a discrimination plaintiff *must* adduce evidence in addition to that comprising the prima facie case and the rebuttal of defendant's justification in order to prevail either at the summary judgment stage or at trial. *See Connell,* 924 F.2d at 1172 n. 3; *but see Olivera,* 922 F.2d at 48 (stating that in this circuit a plaintiff must adduce additional evidence of discrimination). "Rather, the evidence *as a whole,* whether direct or indirect, must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by [discriminatory] animus." *Connell,* 924 F.2d at 1172 n. 3 (emphasis added). If no such inference can be drawn, summary judgment is appropriate.

■ Where the basis of an employment discrimination suit is a denial of tenure, some special considerations apply. First, a plaintiff raises an initial inference of discrimination by adducing proof:

(1) that plaintiff is a member of the protected group;

(2) that plaintiff was a candidate for tenure and was qualified under the college or university's standards, practices or customs;

(3) that despite these qualifications plaintiff was rejected; and

(4) that tenured positions in the relevant department remained open at the time plaintiff was denied tenure, in that others were granted tenure in the department during the same general time period.

*Banerjee v. Board of Trustees of Smith College,* 648 F.2d 61, 62 (1st Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981). As to the second element, the plaintiff need only show that his or her qualifications were at least comparable to those of a "middle group of tenure candidates as to whom both a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise by the tenure decision-making body." *Id.* at 63.

■ A second consideration stressed in our tenure decisions is that it is not the function of the courts to sit as "super-tenure" committees. *See Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 345–46 (1st Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990); *Kumar*, 774 F.2d at 10–11; *Kumar*, 774 F.2d at 12 (Campbell, J., concurring); *Sweeney v. Board of Trustees of Keene State College*, 569 F.2d 169, 175–76 (1st Cir.), *rev'd on other grounds*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). We are hesitant to intrude upon academic freedom, which, "although not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978); *see also Sweezy v. New Hampshire*, 354 U.S. 234, 261–63 (1957) (Frankfurter, J., concurring); *Vargas-Figueroa v. Saldaña*, 826 F.2d 160, 162–63 (1st Cir.1987) ("Courts have wisely recognized the importance of allowing universities to run their own affairs (and to make their own mistakes). To do otherwise threatens the diversity of thought, speech, teaching and research both within and among universities upon which free academic life depends."). At the same time, we recognize that Congress has committed to the federal courts a duty which we may not abdicate: that of eliminating workplace discrimination, within educational settings as well as without. *Brown*, 891 F.2d at 346. Academic freedom does not embrace the freedom to discriminate. *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1154 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

This delicate equilibrium is particularly significant at the third step of the *McDonnell Douglas* order of proof. To prevail at trial, a plaintiff must convince a trier of fact, by a preponderance of the evidence, that the defendant's articulated reasons for denying tenure

> were "obviously weak or implausible," or that the tenure standards for prevailing

at the tenure decisions were "manifestly unequally applied." The essential words here are "obviously" and "manifestly." A court may not simply substitute its own views concerning the plaintiff's qualifications for those of the properly instituted authorities; the evidence must be of such strength and quality as to permit a reasonable finding that the denial of tenure was "obviously" or "manifestly" unsupported.

*Brown*, 891 F.2d at 346 (quoting *Kumar*, 774 F.2d at 15 (Campbell, J., concurring)). We must consider the appropriateness of summary judgment in light of this statement of the plaintiff's ultimate burden at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. at 2512.

## THE EVIDENCE

■ Tino Villanueva has made out a prima facie case.[3] He is a member of a protected class—indeed, several (his complaint describes him as a "brown-skinned male of Mexican–American ancestry", age forty-four at the time of the tenure decision). We find that undisputed material evidence demonstrates that he was qualified for tenure under the *Banerjee* standard, which requires only that a plaintiff be among a "middle group" of tenure candidates. *Banerjee*, 648 F.2d at 63. And he was turned down for tenure while other candidates were approved in the same general period of time.

■ There is also no doubt that Wellesley has articulated a legitimate, nondiscriminatory reason for its tenure decision. The R & P Committee and the CFA both stated their reasons in contemporaneous written documents. Essentially, both committees found that Villanueva was not sufficiently excellent in any of the five categories Wellesley used to evaluate tenure potential: teaching, scholarship, relation of the candidate to the department's structure, service to the college community and exter-

---

**3.** The lower court did not specifically resolve this issue, but merely assumed for the purposes of the summary judgment motion that plaintiff had made out a prima facie case.

nal professional activities.[4]

As to teaching, the committees found that Villanueva was not outstanding. The student evaluations of his performance were not as positive as those presented in most language department tenure cases. The R & P Committee was stronger in its criticism of Villanueva's teaching performance than was the CFA: It found his pace too slow, his pedagogical priorities too independent from those of the department, and his level of literary analysis low.

In the area of scholarship, again the R & P Committee issued a lower report than did the CFA. Although the CFA did not question the quantity of Villanueva's published work, it found that letters from outside evaluators indicated a sense of reservation as to the merits of his work. In most tenure cases the evaluations were more enthusiastic. The R & P Committee concluded that Villanueva had spun the same theme into too many of his published articles,[5] and it also considered his productivity to be inadequate. Both committees acknowledged Villanueva's accomplishments as a poet.

The committees did not consider Villanueva's service to the community to be strong. The CFA criticized his lack of initiative, while the R & P Committee found that, despite requests from the department for more participation, Villanueva's presence in the Wellesley community was inadequate.

Department structure also received some consideration by the committees. At the time of Villanueva's tenure application, Wellesley had a mandatory retirement age of 70.[6] Three of the four tenured members of the Spanish Department were scheduled to retire in the years 2012 and 2013. Villanueva, if tenured, would have retired in 2011. The R & P Committee in particular believed that, in a small department, the consequences of this structure would be adverse. Also considered was the fact that a very strong candidate, Marjorie Agosin, was eligible for tenure the year after Villanueva. If both Villanueva and Agosin received tenure, the Spanish Department, with only six full-time and four part-time faculty members, would have been almost fully tenured. The CFA acknowledged the structural problems, but also noted that if Villanueva's teaching and scholarship credentials had been stronger, it would have granted tenure despite the department structure.

In sum, Wellesley plainly articulated a legitimate and nondiscriminatory reason for its decision to deny Villanueva tenure. The consensus of the CFA was that Villanueva's qualifications were adequate but not outstanding, and that given the structure of the Spanish Department and the reservations expressed by the R & P Committee, a grant of tenure was inadvisable.

Villanueva took two approaches to rebutting Wellesley's justification. First, he attempted to show that he had been subjected to a higher standard than that applied to other tenure candidates in the Spanish Department. To support this claim Villanueva compared various aspects of his tenure record with those of the four professors, all white women, who had been granted tenure in the years surrounding his own tenure application. Villanueva's evidence, taken most favorably to him, demonstrates that in some areas he may have been more qualified than the other candidates. Second, Villanueva introduced statistics in an effort to demonstrate a pattern of discriminatory employment practices at Wellesley.

---

**4.** The fifth category, external professional activities, does not appear to have factored into Villanueva's case.

**5.** Of eight published articles by Villanueva, four were based upon his dissertation and four dealt with related aspects of Chicano history and literature.

**6.** This requirement, which was legal at the time, has since been repealed. To the extent that Villanueva suggests that basing the tenure decision on the criteria of department structure is age discrimination per se, we disagree. The department structure analysis looks at the relative age of the faculty, not the absolute age. Thus, it was irrelevant whether Villanueva was thirty or fifty at the time of the tenure decision; it mattered only when his retirement would occur compared to others in the department.

## DISCUSSION

■ In our judgment, Villanueva failed to rebut Wellesley's justification. Although Villanueva has presented evidence showing that he was qualified for tenure, he has not demonstrated that Wellesley's justification was a pretext; a fortiori, he has not shown that it was a pretext for discrimination.

Two of the professors with whom Villanueva compared himself received tenure six to eight years before he became eligible. Comparisons over such a length of time are simply not probative, especially where, as here, the structure of the relevant department had changed quite dramatically during the intervening years. *See Banerjee*, 648 F.2d at 62. Therefore the two relevant candidates for comparative purposes are Joy Renjilian–Burgy, who received tenure in the 1984–85 academic year, and Marjorie Agosin, tenured in 1987–88. As to these candidates, the undisputed evidence shows that while their qualifications may have been less than or equal to Villanueva's in certain areas, both Renjilian–Burgy and Agosin excelled in other areas. Renjilian–Burgy had received a number of teaching awards, and Agosin was extraordinarily active in her service to the college community.

At any rate, it is not our task to determine which of the candidates would have been Wellesley's best choice for tenure. Villanueva was required to adduce sufficient evidence from which a trier of fact could conclude that Wellesley's articulated reason for the tenure decision was "obviously weak or implausible," or that the standards were "manifestly unequally applied." *Brown*, 891 F.2d at 346 (quoting *Kumar*, 774 F.2d at 15 (Campbell, J., concurring)). Introducing evidence that, at best, indicates that he was as qualified as other tenure candidates does not suffice.

Moreover, nothing in Villanueva's comparative evidence raises the slightest inference that a discriminatory motive lurked beneath the surface. For this showing, Villanueva relied upon certain statistics showing that the percentage of minority faculty members at Wellesley ranged from 2.31% to 3.89% during the years 1979–1987. These statistics, however, are inadequate absent some further indication of their relevance. *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1783, 104 L.Ed.2d 268 (1989) (citing expert testimony that woman partnership candidate's uniqueness among an otherwise all-male candidate group increased the likelihood that critical remarks were the product of stereotyping); *Wards Cove v. Atonio*, 490 U.S. 642, 650–1, 109 S.Ct. 2115, 2121–2, 104 L.Ed.2d 733 (1989) (requiring, in a disparate impact case, information about the composition of the relevant labor market in order to raise an inference of discrimination).

Villanueva's evidence on pretext may raise doubts about the wisdom of Wellesley's tenure decisions. But "[m]erely casting doubt on the employer's articulated reason does not suffice to meet the plaintiff's burden of demonstrating discriminatory intent." *Menard*, 848 F.2d at 287. Rather:

> [T]he evidence as a whole must show more than a denial of tenure in the context of disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university. Absent evidence sufficient to support a finding that such disagreements or doubts are influenced by forbidden considerations such as sex or race, universities are free to establish departmental priorities, to set their own required levels of academic potential and achievements and to act upon the good faith judgments of their departmental faculties or reviewing authorities.

*Zahorik v. Cornell Univ.*, 729 F.2d 85, 94 (2d Cir.1984). It is apparent from the record that reasonable people could differ, and have differed, as to Villanueva's qualifications for tenure. But we may not, and cannot, resolve the dispute; it is not for us to determine whether one professor is a more inspiring teacher, or another a more insightful scholar. Those are matters intertwined with academic freedom, not discrimination protected by law. Merely by showing that such a dispute exists, Welles-

ley has successfully dispelled any inference of discrimination, and none of Villanueva's evidence has brought it back.

We conclude that the undisputed evidence does not raise a genuine issue of material fact as to differential treatment based on impermissible discrimination. Summary judgment was therefore proper and is *affirmed*.