February 18, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1773

ROBERT GOLDMAN,

Plaintiff, Appellant,

v.

FIRST NATIONAL BANK OF BOSTON,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Selya, Circuit Judge,

Higginbotham,* Senior Circuit Judge,

and Cyr, Circuit Judge.

Denise M. Leydon with whom Weston, Patrick, Willard & Redding was

on brief for appellant.
Richard P. Ward with whom Robert B. Gordon and Ropes & Gray were

on brief for appellee.

February 18, 1993

*Of the Third Circuit, sitting by designation.

CYR, Circuit Judge. The First National Bank of Boston
CYR, Circuit Judge.

terminated the employment of appellant Robert Goldman pursuant to

a reduction in force in 1989. Goldman sued the Bank, asserting,

inter alia, age discrimination in violation of 29 U.S.C. 621-

634 ("ADEA") and Mass. Gen. L. ch. 151B, and breach of a lifetime

employment contract. The district court granted summary judgment

in favor of the Bank. We affirm.

I

BACKGROUND

In 1957 the Bank hired Robert Goldman as a clerk in its

Settlement Department. Goldman recalls that Lee Beaulieu, the

personnel officer who interviewed him for the job, told him at

the time he was hired that he would not become wealthy working

for the Bank, but would have a job for life unless he committed a

criminal act against the Bank. Goldman also recalls that Beauli-

eu said the Bank had never laid off an employee.2

Over the ensuing thirty-two years, Goldman held various

positions with the Bank. During the final four years, he worked

as a Custody Administrator in the Custody Administration Unit of

Capital Asset Services, a division of the Treasury and Banking

Services Department, providing administrative services relating

2Goldman recollects that similar representations were
repeated by various supervisors throughout the course of his
employment with the Bank.

to the Bank's custodial security accounts.3

In 1989, the Bank launched a large-scale reduction in

its work force due to mounting losses in its Treasury and Banking

Services operation. The Bank completely reorganized the Treasury

and Banking Services Department, reconfiguring approximately 252

operational functions into approximately 135 functions. As a

result, 119 positions were eliminated. Thomas Keane, Senior

Operations Manager of the Capital Asset Services Department,

determined that it was necessary to eliminate three of the

fifteen positions in the Custody Administration Unit.

After reviewing recent employee performance evaluations

and consulting with unit supervisors, Keane selected three

employees for dismissal: a twenty-four year old, a thirty-seven

year old, and Goldman, then fifty-two. Keane explained that the

twenty-four year old was suspected of misusing a corporate credit

card; the thirty-seven year old and Goldman were considered the

3The Bank is a custodian of securities for various clients,
including banks, insurance companies, colleges, and other insti-
tutions.

Custody Administrators provide necessary administrative
services for the securities accounts of these clients,
and their work involves settling trades according to
client instructions and assuring the proper and accu-
rate recording of transactions that affect these ac-
counts. The Bank strives to be competitive in this
business by having administrators who provide efficient
customer service, and who communicate frequently with
clients both to assure the accuracy of transactions and
to address any potential problems with the administra-
tion of their accounts.

Affidavit of James W. Curran, Account Mgr., Custody Administra-
tion Unit.

3

weakest performers in the unit. Keane represents that Goldman

was responsible for the fewest customer accounts, with the lowest

aggregate market value, and that Goldman's low volume resulted in

large measure from the reassignment of some of Goldman's accounts

due to client complaints. All three positions were permanently

eliminated and Goldman's duties were absorbed by the remaining

employees in the Custody Administration Unit.

II

DISCUSSION

A. Summary Judgment Standard

We review a grant of summary judgment de novo, employ-

ing the same criteria incumbent upon the district court in the

first instance. Pedraza v. Shell Oil Co., 942 F.2d 48, 50 (1st

Cir. 1991), cert. denied, U.S. , 112 S. Ct. 993 (1992).

Summary judgment is appropriate where the record, including the

pleadings, depositions, answers to interrogatories, admissions on

file, and affidavits, viewed in the light most favorable to the

nonmoving party, reveals no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of

law. See Fed. R. Civ. P. 56(c); Canal Ins. Co. v. Benner,

F.2d , (1st Cir. 1992), No. 92-1360, slip op. at 5 (1st

Cir. Nov. 24, 1992); see also Mesnick v. General Elec. Co., 950

F.2d 816, 822 (1st Cir. 1991), cert. denied, U.S. , 112 S.

Ct. 2965 (1992). The nonmoving party "may not rest upon the mere

allegations or denials of the . . . pleadings, but . . . must set

4

forth specific facts showing that there is a genuine issue for

trial." Fed. R. Civ. P. 56(e). See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1985). There is no trialworthy issue

unless there is enough competent evidence to enable a finding

favorable to the nonmoving party. Id. at 249 (citing First Nat'l

Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89

(1968)). Moreover, "[e]ven in cases where elusive concepts such

as motive or intent are at issue, summary judgment may be appro-

priate if the nonmoving party rests merely upon conclusory

allegations, improbable inferences, and unsupported speculation."

Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st

Cir. 1990).

B. Age Discrimination Claims4
B. Age Discrimination Claims

1. The Burden-Shifting Paradigm

A plaintiff alleging age discrimination "bears the

ultimate 'burden of proving that his years were the determinative

factor in his discharge, that is, that he would not have been

4The complaint alleged parallel claims under the ADEA and
its Massachusetts counterpart, Mass. Gen. L. ch. 151B. On
appeal, Goldman asserts for the first time that Massachusetts
applies a less onerous standard of proof to claims brought under
the Massachusetts antidiscrimination statute than this court
applies to ADEA claims, and that his Massachusetts claim there-
fore must be addressed separately. Goldman's opposition to
summary judgment did not distinguish between the federal and
state age discrimination claims, and he relied solely on federal
precedent. Consequently, the district court's analysis did not
distinguish between the state and federal age discrimination
claims. We follow suit, as "theories not raised squarely in the
district court cannot be surfaced for the first time on appeal."
McCoy v. Massachusetts Inst. of Technology, 950 F.2d 13, 22 (1st

Cir. 1991), cert. denied, U.S. , 112 S. Ct. 1939 (1992).

See Mesnick, 950 F.2d at 829 n.11.

5

fired but for his age.'" Mesnick, 950 F.2d at 823 (quoting

Freeman v. Package Machinery Co., 865 F.2d 1331, 1335 (1st Cir.

1988)). Absent direct evidence of age discrimination, the

familiar burden-shifting framework established in McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973), comes into

play. Lawrence v. Northrop Corp., F.2d , (1st Cir.

1992), No. 92-1702, slip op. at 4 (1st Cir. Nov. 25, 1992);

Mesnick, 950 F.2d at 823; Medina-Munoz, 896 F.2d at 8. First,

the plaintiff must make a prima facie showing of discrimination,

McDonnell Douglas, 411 U.S. at 802; Lawrence, slip op. at 4;

Biggins v. Hazen Paper Co., 953 F.2d 1405, 1409 (1st Cir.), cert.

denied, U.S. , 112 S. Ct. 3035 (1992) and cert. granted,

U.S. , 112 S. Ct. 2990 (1992); Mesnick, 950 F.2d at 823;

that is, Goldman must demonstrate that he (1) was at least forty

years of age, (2) met the employer's legitimate job performance

expectations, (3) experienced adverse employment action, and (4)

was replaced by a person with roughly equivalent job qualifica-

tions. Id.; Medina-Munoz, 896 F.2d at 8. A plaintiff whose

employment was terminated in the course of a reduction in force

need not demonstrate that he was replaced, but may show that "the

employer did not treat age neutrally or that younger persons were

retained in the same position." Hebert v. Mohawk Rubber Co., 872

F.2d 1104, 1111 (1st Cir. 1989); see Lawrence, slip op. at 5;

Connell v. Bank of Boston, 924 F.2d 1169, 1173 n.5 (1st Cir.),

cert. denied, U.S. , 111 S. Ct. 2828 (1991).

6

"Establishment of the prima facie case . . . creates a

presumption that the employer unlawfully discriminated against

the employee," Texas Dep't of Community Affairs v. Burdine, 450

U.S. 248, 254 (1981), and the burden of production shifts to the

defendant-employer to "articulate some legitimate, nondis-

criminatory reason" for the termination. McDonnell Douglas, 411

U.S. at 802; Lawrence, slip op. at 5; Biggins, 953 F.2d at 1409;

Mesnick, 950 F.2d at 823. The burden of persuasion remains with

the plaintiff-employee at all times. Lawrence, slip op. at 5;

Mesnick, 950 F.2d at 823 (citing Burdine, 450 U.S. at 253);

Medina-Munoz, 896 F.2d at 9.

The presumption of unlawful age discrimination generat-

ed by the plaintiff-employee's prima facie showing dissipates,

however, provided the employer sustains its burden of production;

the plaintiff-employee must then demonstrate that the proffered

reason for the adverse employment action was simply a pretext for

age discrimination. Lawrence, slip op. at 6; Mesnick, 950 F.2d

at 823; Connell, 924 F.2d at 1172. The plaintiff must do more

than cast doubt on the employer's justification for the chal-

lenged action; there must be a sufficient showing that discrimi-

natory animus motivated the action. Lawrence, slip op. at 6-7;

Mesnick, 950 F.2d at 824; Villanueva v. Wellesley College, 930

F.2d 124, 127-28 (1st Cir.), cert. denied, U.S. , 112 S.

Ct. 181 (1991); Connell, 924 F.2d at 1172. Direct or indirect

evidence of discriminatory motive may do, but "the evidence as a

whole . . . must be sufficient for a reasonable factfinder to

7

infer that the employer's decision was motivated by age animus."

Connell, 924 F.2d at 1172 n.3; see also Lawrence, slip op. at 6-

7, Mesnick, 950 F.2d at 825; Villanueva, 930 F.2d at 128.

Under First Circuit caselaw, the plaintiff-employee

must adduce minimally sufficient evidence of pretext and discrim-

inatory animus. Lawrence, slip op. at 6-7 (citing Mesnick, 950

F.2d at 825; Villanueva, 930 F.2d at 127; Connell, 924 F.2d at

1172; Medina-Munoz, 896 F.2d at 9; Olivera v. Nestle Puerto Rico,

Inc., 922 F.2d 43, 48 (1st Cir. 1990)). A showing that the

employer's justification was not the actual motive may be enough

if the facts and circumstances raise a reasonable inference of

age discrimination. Connell, 924 F.2d at 1175. Nevertheless,

the plaintiff-employee cannot avert summary judgment if the

record is devoid of direct and circumstantial evidence of dis-

criminatory animus on the part of the employer. Lawrence, slip

op. at 6-7 n.1.5

5Appellant argues that our cases place a more onerous burden
on an ADEA plaintiff than that envisioned by the Supreme Court in
McDonnell Douglas and Burdine. Accord Connell, 924 F.2d at 1183

(Bownes, J., dissenting) (suggesting that Burdine permits a

plaintiff to prove employment discrimination "either by direct

evidence of discrimination or by successfully rebutting the

employer's articulated reasons."). We do not agree. Fed. R.
Civ. P. 56 requires the nonmoving party to demonstrate the
existence of a dispute of material fact; in order to do so,
Goldman "must raise an inference of discriminatory motive under-
lying the pretextual explanation." Villanueva, 930 F.2d at 128

(citing Medina-Munoz, 896 F.2d at 9). It is not the province of

the courts to sit as "super personnel departments, assessing the
merits or even the rationality of employers' nondis-
criminatory business decisions." Mesnick, 950 F.2d at 825. "The

'ADEA does not stop a company from discharging an employee for
any reason (fair or unfair) or for no reason, so long as the
decision to fire does not stem from the person's age.'" Id.

(quoting Freeman v. Package Machinery Co., 865 F.2d 1331, 1341

8

The Bank does not challenge the district court ruling

that Goldman made out a prima facie age discrimination claim.

Nor does Goldman challenge the finding that the Bank met its

burden at the second stage of the McDonnell Douglas burden-

shifting analysis by articulating a nondiscriminatory motive for

Goldman's dismissal; namely, that economic considerations neces-

sitated a reduction in force and Goldman was selected for termi-

nation because he was "the weakest performer and least qualified

employee" in his unit. At the third and final stage of the

McDonnell Douglas analysis, the district court ruled that Goldman

had failed to present sufficient evidence either to rebut the

Bank's proffered justification for Goldman's dismissal or to

support an inference of discriminatory animus. The Bank accord-

ingly won summary judgment on the state and federal age discrimi-

nation claims. Contending that the district court weighed the

competing evidence, rather than viewing it in the light most

favorable to him, Goldman maintains that there is sufficient

record evidence of pretext and age animus to clear the summary

judgment hurdle.

2. Evidence of Pretext

"In assessing pretext, [our] 'focus must be on the

perception of the decisionmaker,' that is, whether the employer

(1st Cir. 1988)). Since an employer's nondiscriminatory motiva-
tions for adverse employment decisions are irrelevant in an age
discrimination case, a "mere showing that the employer's articu-
lated reason may shield another (possibly nondiscriminatory)
reason does not create a dispute of material fact" sufficient to
withstand summary judgment. Villanueva, 930 F.2d at 128.

9

believed its stated reason to be credible." Mesnick, 950 F.2d at

824 (quoting Gray v. New England Tel. & Tel. Co., 792 F.2d 251,

256 (1st Cir. 1986) (emphasis added)). Goldman does not dispute

that the Bank effected the reduction in force in order to reduce

costs. Instead, he argues that he produced enough evidence to

rebut the Bank's contention that he was the weakest and least

qualified employee in his unit. Goldman established that he had

received merit salary increases on a regular basis throughout his

tenure with the Bank, received commendations and accolades from

Bank clients over the years, and received no warnings relating to

his work performance. Although Goldman received mixed perfor-

mance evaluations, he disputed their accuracy and fairness.

Goldman presented substantial evidence that the Bank

did not consider his work performance unsatisfactory in absolute

terms. But the Bank consistently has maintained that Goldman was

discharged strictly because he was the least qualified employee

in the Custody Administration Unit. It submitted comparative

evidence as to the account workloads of all custody administra-

tors in Goldman's unit. There is no dispute that Goldman, among

all custody administrators, was responsible for the fewest

accounts, having the lowest aggregate market value. In these

circumstances, refutation of the proffered justification for

Goldman's discharge required evidence from which the trier of

fact reasonably could conclude that Goldman's abilities and

qualifications were equal or superior to employees who were

retained. As Goldman made no such evidentiary showing, whatever

10

slight shadow of doubt may have been cast upon the proffered

justification for his dismissal is too faint to raise the spectre

of pretext.

11

3. Evidence of Age Animus

Evidence of age animus "need not be of the 'smoking

gun' variety," but the totality of the circumstances must permit

a reasonable inference that the employer's justification for the

challenged action was a pretext for age discrimination. Connell,

924 F.2d at 1175 (citing Burdine, 450 U.S. at 256). Goldman

insists that several pieces of evidence, considered collectively

or individually, support an inference of discriminatory animus on

the part of the Bank.

First, Goldman claims that discriminatory animus is infer-

able from the affidavits of eight former Bank employees, each

stating that the affiant was the eldest, or one of the eldest,

employees in a particular unit at the Bank and was performing

adequately when dismissed pursuant to the reduction in force.

According to Goldman, the fact that several older, long-term

employees with satisfactory performance records were terminated

could lead a reasonable factfinder to conclude that Goldman would

not have been terminated but for his age. On the contrary, as

the district court observed, anecdotal evidence of this sort does

little more than "corroborate what was undisputed: that members

of the protected class were terminated as part of the [reduction

in force]." Evidence that eight employees, among the 119 select-

ed for dismissal, were among the eldest in their respective units

does not give rise to a reasonable inference that older employees

were disproportionately affected by the reduction in force, much

less that age discrimination motivated their dismissal.

12

Second, Goldman theorizes that the termination of

older, more costly, employees would optimize the cost reductions

achieved through the reduction in force. The implication,

Goldman suggests, is that the Bank was biased against older

employees in effecting the workforce reduction.6 Yet Goldman

submitted no evidence either that older employees were more

costly to the Bank than younger employees or that older employees

were disproportionately affected by the reduction in force. See

Mesnick, 950 F.2d at 822 (evidence presented by party opposing

summary judgment "'cannot be conjectural or problematic'")

(quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181

(1st Cir. 1989)).

Third, Goldman contends that the Bank's introduction of

a new retirement plan raised an inference of discriminatory

animus. In 1989 the Bank replaced its pension plan with a new

"Cash Balance" plan. The Bank informed its employees, at the

time, that its objective was "to make the Bank's retirement

benefits a visible, attractive benefit to our entire employee

population regardless of age" and to "reward employees based

6Goldman notes that 41% of the 119 employees terminated in
May 1989 were over forty years of age, but that among the 21 ter-
minated employees subsequently rehired, only 5, or 24%, were over
forty. Statistical evidence that older employees were terminated
at a disproportionate rate may provide strong evidence of age
discrimination. See Mesnick, 950 F.2d at 824; Connell, 924 F.2d

at 1177. However, the present record includes no evidence as to
the age composition of the workforce subject to termination, or
of the pool of applicants seeking reemployment, against which to
compare the data Goldman cites. In fact, at oral argument
Goldman disclaimed any statistical argument based on these
incomplete data.

13

upon individual performance." Under the new plan, the Bank

opened a "Cash Balance" account for each employee and credited

the account annually with a percentage of the employee's sala-

ry.7 After five years of service, all funds in the Cash Balance

account may be withdrawn by employees who are no longer employed

by the Bank. Goldman argues that the new plan favors younger

employees and raises an inference of age animus because it

requires the Bank to deposit a decreasing percentage of salary to

the Cash Balance account as the employee reaches the upper

service brackets and because its stated purpose is to make the

plan more attractive to the 85% of Bank employees for whom the

former pension plan represented "a benefit for the distant

future."

Goldman's argument is deficient, however, in that there

is no evidentiary foundation for the premise that the new plan

disadvantages older employees. The fact that the Bank contrib-

utes decreasing percentages of salary to the Cash Balance account

after the employee reaches the thirty-five year service threshold

7The percentage of salary credited annually to the Cash
Balance account depends on the number of years of service with
the Bank:

Percentage of Salary Credited
Years of Service to Cash Balance Account

0 - 1 0%
1 - 2 3.25%
3 - 4 4%
5 - 9 5%
10 - 14 6%
15 - 19 8%
20 - 34 11%
35 - 39 6%
40+ 0%

14

is insufficient to create an inference of age animus absent

evidence that the resulting retirement benefit would be lower

than the benefit the employee would have received under the

former plan. Moreover, Goldman's argument ignores the safeguards

put in place by the Bank to ensure that employees fifty-five or

older with ten years of service, or employees at any age with

twenty years of service, would experience no reduction in bene-

fits. When an employee in either of these service categories

retires or leaves the Bank, benefits are calculated under both

the old pension plan and the new Cash Balance plan; the employee

is entitled to receive the greater benefit. Thus, these employ-

ees cannot be disadvantaged by the introduction of the new

plan.8

These safeguards do not necessarily cover all employees

in the protected class, however, as those between forty and

fifty-five with less than twenty years of service and those

fifty-five or older with less than ten years of service at the

time the new plan became effective fall outside the scope of the

safeguard provision. Rather, at retirement or termination, these

employees receive benefits under both plans. The retirement

benefit under the former plan is based upon the length of service

as at December 31, 1988; under the new plan the benefit consists

of the funds accumulated in the Cash Balance account after

8Goldman argues that the safeguards would have been unneces-
sary if the new plan did not deprive these employees of benefits
to which they would have been entitled under the former plan.
Clearly, Goldman's argument entirely ignores the safeguards.

15

December 31, 1988. Goldman has adduced no evidence, nor has he

argued, that benefits calculated under these provisions are lower

than those obtainable under the former pension plan for members

of the protected class. Accordingly, no reasonable inference of

age bias can be drawn on the present record.

Finally, Goldman maintains that the Bank's decision to

disband the "Quarter Century Club," a Bank-sponsored social

organization for employees with twenty-five years or more of

service,9 uniquely and adversely affected older employees and

therefore is indicative of age bias. Goldman does not dispute

that the Bank stopped funding the Quarter Century Club as part of

its program to reduce discretionary costs. There is no direct

evidence that considerations of age, as distinguished from

neutral cost-saving considerations, entered into the decision to

disband the organization, and the bare fact that the Bank stopped

funding the Quarter Century Club to reduce costs clearly is

insufficient to support a reasonable inference that Goldman's

dismissal was motivated by age discrimination.

Even viewed collectively, see Mesnick, 950 F.2d at 824

(citing Olivera, 922 F.2d at 50) (We do not "look at evidence of

discrimination . . . in splendid isolation, but as part of an

aggregate package of proof offered by the plaintiff."), the

evidence was insufficient to enable a reasonable factfinder to

9The record on appeal contains no evidence as to the bene-
fits associated with Quarter Century Club membership. At oral
argument, counsel allowed as how members received small gifts in
recognition of their loyal service and were honored at an annual
dinner.

16

infer that age discrimination motivated the Bank's decision to

dismiss Goldman. Stripped of its speculative chaff, at best the

record reveals that a small number of those discharged were among

the older employees in their respective units, that the Bank

implemented a new pension plan which has in no measure been shown

to have been disadvantageous to older employees, and that the

Bank stopped funding the Quarter Century Club. The gap between

this evidence and an inference of age discrimination could only

be bridged by impermissible inference. As Goldman established

neither pretext nor age animus, the district court correctly

granted summary judgment on the age discrimination claims.

C. Breach of Lifetime Employment Contract

Goldman maintains that Lee Beaulieu, a personnel

officer, offered him lifetime employment by representing that the

Bank had never laid off employees and that Goldman would have a

job for life unless he committed a criminal act against the

Bank.10 Even though it is far from clear that the sort of

representations made by Beaulieu import an oral offer of lifetime

employment, for present purposes we assume as much arguendo.

Under Massachusetts law, a lifetime employment contract

cannot be found absent evidence that it was made or ratified by

an officer or agent with actual or apparent authority to bind the

employer to a lifetime contract. See Rydman v. Dennison Mfg.

Co., 373 Mass. 855, 366 N.E.2d 763 (1977); Porshin v. Snider, 349

10Goldman had no written employment contract with the Bank.

17

Mass. 653, 654, 212 N.E.2d 216, 217 (1965); Thalin v. Friden

Calculating Mach. Co., 338 Mass. 67, 70, 153 N.E.2d 658, 660

(1958); Simonelli v. Boston Hous. Auth., 334 Mass. 438, 440-41,

137 N.E.2d 670, 672-73 (1956). As there is no evidence that the

Bank invested Beaulieu with actual authority to extend a binding

offer of lifetime employment to anyone, we need only determine

whether Goldman has demonstrated a genuine factual dispute

material to the issue of apparent authority.

"Apparent or ostensible authority 'results from conduct

by the principal which causes a third person reasonably to

believe that a particular person . . . has authority to enter

into negotiations or to make representations as his agent.'"

Hudson v. Massachusetts Property Ins. Underwriting Ass'n, 386

Mass. 450, 457, 436 N.E.2d 155, 159 (1982) (quoting W. A. Seavey,

Agency 8D at p. 13 (1964)) (emphasis added). "It is a 'fundam-

ental rule that apparent authority cannot be established by the

putative agent's own words or conduct, but only by the princi-

pal.'" Sheinkopf v. Stone, 927 F.2d 1259, 1269 (1st Cir. 1991)

(quoting Sheldon v. First Fed. Savings & Loan Ass'n, 566 F.2d

805, 808 (1st Cir. 1977)) (emphasis added). We therefore examine

the record for conduct on the part of the Bank that could have

prompted Goldman reasonably to believe that Beaulieu was autho-

rized to hire him as a lifetime Bank employee.

A person appointed to a position with generally recog-

nized functions may be found to possess apparent authority to

perform the duties ordinarily entrusted to one occupying that

18

position. Restatement (Second) of Agency 27 cmt. a (1958).

Clearly, Beaulieu, a personnel officer, had either actual or

apparent authority to hire Bank employees. Ordinary authority to

hire, however, is insufficient to bind the employer to a lifetime

employment contract. Boleman v. Congdon and Carpenter Co., 638

F.2d 2, 4 (1st Cir.), cert. denied, 454 U.S. 824 (1981) (applying

Massachusetts law). "[R]arely . . . [do] circumstances exist

which would give rise to apparent authority, of even a principal

corporate officer, to employ another for life." Thalin, 338

Mass. at 70, 153 N.E.2d at 660; see Annotation, Power of Corpo-

rate Officer or Agent to Hire Employees for Life, 28 A.L.R.2d

929, 933 (stating that "[i]n the absence of express authority, it

has generally been held or recognized that corporate officers or

agents do not have the power or authority to hire employees for

life").

Goldman suggests that apparent authority should be

inferred because his only contact at the time he was hired was

with Beaulieu and he had no way of knowing that lifetime employ-

ment contracts with the Bank were extraordinary. As the great

weight of authority makes clear, however, a corporate personnel

officer's general hiring authority does not suffice to establish

apparent authority to bind the employer to a lifetime employment

contract, irrespective of any awareness on the part of the

employee that lifetime employment contracts with the employer

were extraordinary. See Rydman, 373 Mass. at 855, 366 N.E.2d at

764 (suggesting that even explicit assurances by corporate

19

officers or agents do not bind a corporate employer to employment

contracts of extraordinary duration unless the contract was

either made or ratified by an officer with actual or apparent

authority to so bind the corporation); Porshin, 349 Mass. at 654,

212 N.E.2d at 217 (finding general manager's authority to hire

and fire insufficient to "clothe him with ostensible authority to

make a contract for permanent employment"); Simonelli, 334 Mass.

at 440-41, 137 N.E.2d at 672 (finding assurances of lifetime

employment made by personnel manager and project director insuf-

ficient to create lifetime employment contract absent ratifica-

tion by the employer); Braden v. Trustees of Phillips Academy,

321 Mass. 53, 71 N.E.2d 765 (1947) (holding that comptroller had

no authority to hire assistant comptroller for life absent

conduct by employer that could have caused plaintiff-employee

reasonably to believe the comptroller was authorized to offer

lifetime employment). Holding Beaulieu out as its agent for

general hiring purposes did not constitute conduct warranting an

objectively reasonable belief that Beaulieu had Bank authority

to hire anyone for life.

Apparent authority to offer a binding lifetime employ-

ment contract may be found in the rare circumstance where it is

customary for a particular officer or agent to make such a

lifetime contract. 28 A.L.R.2d at 938. See Braden, 321 Mass. at

55, 71 N.E.2d at 766. The Bank submitted competent affidavits

attesting that Beaulieu had no actual authority to bind the Bank

to a lifetime employment contract and that no employee has a

20

lifetime contract with the Bank. Goldman suggests, however, that

an inference that lifetime employment contracts were commonplace

at the Bank can be drawn from the assurances of Beaulieu and

several supervisors that he had a job for life and that no

employee had ever been laid off.

"Lifetime contracts are extraordinary in their nature

and strong proof is required to establish their due formation."

Gregory v. Raytheon Serv. Co., 27 Mass. App. Ct. 1170, 1171, 540

N.E.2d 694, 695 (1989); accord Boleman, 638 F.2d at 4 (finding a

putative lifetime employment contract "well within the category

of extraordinary agreements requiring the strongest proof of

authority by the one making it to bind a corporate employer").

Although widespread knowledge that the Bank had never laid off an

employee except for criminal conduct might prompt the legitimate

belief that employment at the Bank was relatively secure, it

cannot be considered competent proof, let alone "strong proof,"

Gregory, 27 Mass. App. Ct. at 1171, 540 N.E.2d at 695, that any

Bank employee had a lifetime employment contract. Absent evi-

dence of any lifetime employment contract with the Bank at any

level under any circumstances we must conclude that a rational

factfinder could not reasonably find that lifetime employment

contracts with the Bank were customary.

Although Goldman failed to generate a trialworthy issue

as to whether Beaulieu possessed apparent authority to offer

lifetime Bank employment, we must still consider whether any

officer, with authority to bind the Bank, subsequently ratified

21

Beaulieu's unauthorized offer of lifetime employment. See

Restatement (Second) of Agency 82 (1958); 28 A.L.R. at 938-40;

Rydman, 373 Mass. at 855, 366 N.E.2d at 764; Simonelli, 334 Mass.

at 441, 137 N.E.2d at 672.

Goldman attests that the concept of lifetime employment

was reinforced by various supervisors throughout his tenure at

the Bank. Ratification is not established, however, unless the

subsequent assurances were made by one with actual or apparent

authority to bind the Bank to a lifetime employment contract.

See Rydman, 373 Mass. at 855, 366 N.E.2d at 764; Restatement

(Second) of Agency 93 cmt. c (1958). As the record contains no

evidence that any supervisor who represented that Goldman was

employed for life had actual or apparent authority to determine

the terms of Goldman's employment contract, much less bind the

Bank to a lifetime contract, no trialworthy issue was raised

relating to the ratification claim.11

As Goldman generated no trialworthy issue relating to

the lifetime employment contract claim, summary judgment was

proper.

Affirmed.

11The Bank's pre-1989 practice of not discharging employees
except for criminal conduct is entirely consistent with universal
at-will employment and does not constitute affirmance of a
lifetime contract. See Restatement (Second) of Agency 93

(1953) ("affirmance can be established by any conduct of the
purported principal manifesting that he consents to be a party to
the transaction, or by conduct justifiable only if there is
ratification").

22