Gerald L. BLOOMFIELD, Plaintiff,

v.

BERNARDI AUTOMALL TRUST d/b/a Bernardi Toyota; James P. Carney, trustee; Amy D. Rossi, trustee; and Norman T. Wagner, Defendants.

No. CIV. A. 99–12260–DPW.

United States District Court, D. Massachusetts.

Aug. 21, 2001.

———

Jay Shepherd, Shepherd & Ebel, LLP, Boston, MA, Martin Scott Ebel, Shepherd & Ebel, LLP, Boston, MA, for plaintiff.

James L. Frederick, Frederick & Associates, Brookline, MA, Richard A. Zucker, Frederick & Associates, Brookline, MA, for defendants.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Gerald L. Bloomfield brings this action against his former employer for allegedly firing him because of his age (Counts I and III), for firing him to deprive him of the benefit of his retirement plan (Count II), and for failing to pay him commissions that are due him (Count IV).

I have before me the defendants' motion for summary judgment, which argues that the plaintiff has failed to produce sufficient evidence that his termination was discriminatory. In particular, defendants contend that Bloomfield has not adduced any evidence that his employer's reasons for terminating him were pretext for discrimination. I disagree. Bloomfield has produced sufficient evidence from which a reasonable jury could conclude that at least two of the three proffered explanations were not the true reason he was terminated. Bloomfield has also produced evidence supportive of an inference that the third reason was pretext as well. Finally, he has produced some statistical evidence suggestive of disparate treatment

which could support a jury's conclusion that Bloomfield was terminated because of his age. Therefore I will deny the motion for summary judgment.

## I. Background

Prior to November 15, 1997, the plaintiff Gerald Bloomfield was a "sales professional" at Defendant Bernardi Toyota, an automobile dealership.[1] On November 12, Bloomfield was suspended for three days. On November 15, 1997, when he was 51 years old, Bloomfield was terminated by Norman Wagner, then General Manager of Bernardi Toyota. The reasons given for his termination were tardiness, a low "customer service" index rating, and "disruption of sales staff by passing out materials not conducive to a working environment." Bloomfield contends that the true reason for his termination was discrimination because of his age.

James Jubb, a sales manager at Bernardi, testified that Bloomfield "was the second top salesman as far as dollars go" and that "his performance was good." Michael Earle, another sales manager at Bernardi, described Bloomfield as "a diligent worker, sold a lot of cars, he was a great salesman." In October 1997, the last full month before Bloomfield's termination, he sold more cars than any other salesperson.

## A. Tardiness

Bernardi claims that Bloomfield was terminated partially because of persistent tardiness. Bloomfield's November 12th Employee Warning Notice cites him for being late November 8, 9 and 12. In addition, Earle, one of the managers at Bernardi, stated that he had heard from other sales managers that Bloomfield had been given

---

1. The defendants are actually Bernardi Automall Trust which does business as Bernardi Toyota; James P. Carney and Amy D. Rossi, who are the trustees of Bernardi Automall Trust; and Norman T. Wagner, who was the General Manager of Bernardi Toyota at the time the plaintiff was terminated. Hereafter I refer to the defendants collectively as "Bernardi."

a warning for poor attendance. Jubb, another sales manager at Bernardi, reported that Bloomfield was "late a few times" and that his tardiness was one of the factors supporting his termination. Wagner, the former General Manager for the Bernardi chain, testified that Bloomfield's termination was caused, among other things, by his "[c]onsistent lateness" of which Wagner was informed by some of the managers, and confirmed by reviewing Bloomfield's file. Bloomfield testified, however, that he was not habitually tardy and that the only time he was tardy in the week prior to his termination was on November 12th when he was five minutes late. Furthermore, Bloomfield's employment record contains no reference to tardiness prior to November 12, 1997.

## B. Customer Satisfaction

On July 21, 1997, Bloomfield received a written warning from Bernardi regarding his low Customer Service Index ("CSI") rating.[2] The CSI is a measure of customer satisfaction that is generated by Toyota by questioning purchasers of new cars about their experience. The Employee Warning that Bloomfield received threatened "[d]ismissal on Sept 15th 1997 if CSI is not over 95%." In 1997 seven sales professionals other than Bloomfield had CSIs under 95%, only one of whom was disciplined, and he was 56 years old. The reliability of the CSI as a gauge of Bloomfield's ability was compromised by the fact that no surveys were performed for used-car sales, and by the fact that on occasion a new salesperson, before he or she was entered into the tracking system, was reported under Bloomfield's name.

## C. Passing Out Materials

On the morning of November 10, 1997, Bloomfield, some other salespeople, Jubb and Earle attended a meeting at which various concerns were aired including, among others, a concern with the low profit margin on sales. A sale at a price that is only marginally above the invoice price of an automobile is called a "minideal." At that time, Bernardi was paying a flat commission of $50 to salespersons for minideals. Some salespersons believed that other dealerships were paying $100 commissions and suggested that the minideal commission should be increased. In response to the concern that the pay structure was insufficient in light of the large number of minideals, Jubb said that he would compile some information about minideals.

A minideal list was in fact prepared by Karen Sahuc, an employee of Bernardi, at the request of Sandra Guerreiro, another employee of Bernardi. The minideal list was placed on the "sales tower," the sales managers' working area which consists of a long desk.

On the afternoon of November 10, Bloomfield saw Earle and some other salespeople congregated at the sales tower looking at a sheet of paper that he later learned was the minideal list.[3] Bloomfield later took the minideal list off the sales tower, made copies of it, wrote comments on it, and distributed it with his comments to other salespeople. He tabulated the percentage of minideals performed by each salesman and wrote on the list "Buck over Boys / Store Favorites / Ray / Ron / Matt / Tim." The parties dispute the meaning of the comments Bloomfield wrote on the minideal list. Bernardi argues that "Buck

---

**2.** The Warning Notice also refers to the "SSS," which stands for Sales Satisfaction Survey, and appears to be used interchangeably with CSI.

**3.** The defendant places the event "on or about November 12, 1997." I adopt, for purposes of this motion, the plaintiff's testimony about the date of the event.

over Boys" has sexual connotations, implying a homosexual act, and is in any case offensive to the salesmen named, even if none complained of being offended. Bloomfield contends that he was merely poking fun. Bloomfield and Bernardi disagree over whether the minideal list was a confidential document.

On November 12, 1997 Bloomfield was suspended for three days. On November 15, he was permanently terminated. On May 14, 1998, Bloomfield filed a charge of discrimination with the Massachusetts Commission Against Discrimination, which he withdrew on July 26, 1999. He then filed the complaint in this court on November 1, 1999.

## II. Summary Judgment Standard

The court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating the record to discern whether the movant is entitled to a judgment as a matter of law, I must "view all the facts in the light most favorable to the nonmoving party and indulge all inferences advantageous to that party, provided they arise reasonably from the record." *Villanueva v. Wellesley College*, 930 F.2d 124, 127 (1st Cir.1991). However, I need not credit "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

## III. Age Discrimination (Counts I and III)

■ Both the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), and the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B § 4(1B), prohibit employers from discriminating against employees on the basis of their age. Under both the federal and the state regime no liability attaches unless age actually motivated the employer's decision. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Wooster v. Abdow Corp.*, 46 Mass. App.Ct. 665, 671, 709 N.E.2d 71 (1999). And proof under both regimes may be directed to the three-step analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Villanueva*, 930 F.2d at 127 n. 2 ("[w]e do not distinguish further among the various statutes, as the standards of liability under all are substantially identical").

### A.

First, in the current factual setting, the plaintiff must make a prima facie case by showing that (1) he is a member of the protected class, (2) he is qualified for the position, (3) he was terminated, and (4) he was replaced by someone with similar qualifications. *See Abramian v. President & Fellows of Harvard College*, 432 Mass. 107, 116, 731 N.E.2d 1075 (2000).

■ The plaintiff has met these four requirements. First, he was 51 years old when terminated and was therefore within the class protected by the age discrimination statutes. Second, he had been a car salesman for years and there is significant evidence that he performed well. Third, he was terminated on November 15, 1997. Finally, the next salesman hired by Bernardi after Bloomfield's termination was 33 years old. No argument has been made that new salespersons hired after Bloomfield's termination have some special qualification that Bloomfield lacked.

### B.

Once the plaintiff has made a prima facie case, as Bloomfield has, the employer

has the opportunity to rebut the presumption created by the prima facie case by articulating a nondiscriminatory reason for the plaintiff's termination and supporting its theory with admissible evidence. *See Feliciano De La Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 5 (1st Cir.2000). In this case, Bernardi argues that it fired Bloomfield for three reasons: 1) tardiness, 2) a low customer service index rating, and 3) appropriating a confidential document, writing insulting remarks on it, and circulating it to the sales staff.

In support of its claim that Bloomfield's habitual tardiness was a cause of his termination, Bernardi offers the testimony of Jubb, Earle and Wagner who report that they were told by others of Bernardi's tardiness, and that it was a factor in the decision to fire him. In support of its claim that Bloomfield was terminated for poor performance, Bernardi offers a written warning Bloomfield received on or about June 21, 1997 regarding his low CSI. This Employee Warning Notice, which referred to a prior oral warning given on June 2, 1997, threatened that Bloomfield would be dismissed on September 15, 1997 if his CSI was not raised to over 95%. Finally, in support of its claim that Bloomfield was terminated because he took the "minideal list", wrote insulting comments on it, and distributed it to the sales staff, Bernardi offers the testimony of Earle, Jubb, and Wagner.

### C.

■ Once the defendant has articulated a nondiscriminatory reason for terminating the plaintiff, as the defendant has done here, the plaintiff must produce evidence that could enable a reasonable jury to conclude that the defendant's articulated reason is a mere pretext and that the actual cause of the termination is discrimination. *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

Both the United States Supreme Court and the Massachusetts Supreme Judicial Court have recently clarified what the plaintiff must show at this stage. The United States Supreme Court held that if the plaintiff shows that the defendant's purported justification for termination is mere pretext, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147, 120 S.Ct. 2097 (emphasis in original). No additional independent evidence of discrimination is necessary. However, the Court cautioned that

> this is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

*Id.* at 148, 120 S.Ct. 2097 (emphasis in original).

■ The SJC has similarly held that a finding that the employer's purported explanation is mere pretext may support an inference that the employer unlawfully discriminated. *Abramian*, 432 Mass. at 118, 731 N.E.2d 1075. While the finder of fact must make an independent determination of whether it is more likely than not that the employer discriminated, taking into account both evidence that the employer's purported explanation was pretext and other independent evidence of discrimination if it is offered, evidence that the employer is not telling its true reasons for its actions may be sufficient to survive summary judgment. *See id.*

Thus, both the United States Supreme Court and the SJC have held that a claim

may survive summary judgment solely because evidence has been produced that the employer has given a false reason for its actions. The logic behind this holding is that if an employer is giving a false reason for its actions, under certain circumstances a reasonable person may fairly infer that it is doing so to hide an impermissible real reason. *See Abramian,* 432 Mass. at 118, 731 N.E.2d 1075 (*quoting Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 446, 646 N.E.2d 111 (1995)); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). That inference may be sufficient to permit a case to survive summary judgment.

Even more recently, the SJC has reaffirmed the holding of *Abramian* and clarified an additional point relevant to the present case. In *Lipchitz v. Raytheon Co.,* 434 Mass. 493, 751 N.E.2d 360 (2001), the SJC held that a denial of a motion for directed verdict was proper when

> [t]he plaintiff presented sufficient evidence from which a reasonable jury could find that at least one of [the defendant's] reasons was false and from this it properly could have inferred that she was not promoted because of unlawful discrimination.

*Id.* at 498, 751 N.E.2d 360. The implication of this language is that if numerous reasons are given for a termination, a claim ought to survive summary judgment if there is evidence that one of them is untrue, even if no evidence can be produced to support an inference that the others are false. The logic behind this approach is that evidence of even one lie by the employer could be sufficient to raise an inference that the true reason was discrimination.[4]

■ In this case, Bloomfield has produced sufficient evidence that a reasonable jury could conclude that neither tardiness nor lack of performance constituted a real reason he was terminated. The third reason—that Bloomfield was terminated for taking and defacing a confidential document—is more problematic. However, given the totality of the present circum-

---

4. *Lipchitz* cites *Abramian* to support its "at least one" false reason approach, and *Abramian,* in turn quotes *Blare,* which was quoting *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). However, the approach advocated by *Lipchitz* does not follow from the logic employed in *Furnco.* In *Furnco,* the Court observed it is "our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons ... have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration ...." *Furnco,* 438 U.S. at 577, 98 S.Ct. 2943 (emphasis in original). This passage suggests not that a single lie by an employer creates a permissible inference that the real reason is discrimination, but rather that an inability by an employer to produce *any* real non-discriminatory reason may create such an inference. Thus, under *Furnco* and *Blare* at least, if an employer produced two reasons—one of which was not true and the other of which was true—an inference of discrimination would not necessarily be warranted.

However, the SJC repeats in *Lipchitz* that an inference may be proper if "at least one" of the employer's proffered reasons is false. 434 Mass. at 498, 506–07, 751 N.E.2d 360. To be sure, that language is not compelled by the holding of the case and appears to be dicta since the *Lipchitz* court observed that a jury in that case could have found that both of the employer's stated reasons were pretext. *Id.* at 498–99, 751 N.E.2d 360. Nevertheless, despite some misgivings concerning whether the *Lipchitz* language, with its emphasis on "at least one" false reason, fairly states the principles of federal law, it is plainly the last word on Massachusetts law and represents the minimum standard plaintiff must meet for his discrimination claims to survive.

stances, including statistical evidence that may be suggestive of a bias in favor of younger salespeople, the claim ought to survive summary judgment.

In response to Bernardi's claim that it fired Bloomfield for tardiness, Bloomfield contests the facts on which Bernardi relies. Bloomfield testified that prior to his suspension on November 12, he had never been warned or disciplined for tardiness or attendance problems and his file contains no warning for tardiness. Furthermore, Bloomfield reported that other younger salespersons "were tardy often enough to warrant intervention by James Jubb," but that he never was.

In response to Bernardi's claim that Bloomfield was terminated because of his poor CSI rating, Bloomfield offers evidence that in 1997 eight salespeople had CSI ratings lower than the 95 score that Bernardi required Bloomfield to attain on threat of termination. Of those eight, only two were disciplined: Bloomfield and Jerald Peters, then aged 56. Furthermore, Bloomfield argues that low CSIs were not normally grounds for termination. This assertion is supported by the testimony of Jubb who reported that he could not recall whether employees would ever be penalized in any way for low CSIs, other than possibly losing their bonus. Bloomfield also argued that it would not have made sense for Bernardi to fire him because of low CSIs since the CSI could be unreliable, as when inexperienced employees' CSI results were reported under the names of more experienced salespeople. Bloomfield also argued that the CSI did not apply to him because it only applied to new, not used, car sales, and he primarily sold used cars. Finally, Bloomfield points to the evidence that he was considered a good salesman by the managers at Bernardi, such as Jubb and Earle, and to his sales records which show that in the month before his termination he sold more cars than any other salesperson.

A reasonable jury could conclude that tardiness and performance were not the real reasons Bloomfield was terminated. The fact that there is no record of concern with his tardiness until November 12, and that he contests as a matter of fact that he was tardy in the week before November 12, coupled with the fact that none of the managers had specific personal knowledge of Bloomfield's record of tardiness, could lead a jury to doubt the veracity or sincerity of the tardiness explanation. Poor performance is a more plausible explanation since Bloomfield had been recently warned that his CSI was too low. However, a fact finder could conclude that poor performance was not the real reason for Bloomfield's termination based on the evidence that other employees were not disciplined for a comparable CSI and the fact that some question was raised about whether the CSI was normally used to determine whether to terminate employees, especially an employee whose performance as measured by sales was so high.

Evaluating Bernardi's third explanation, that Bloomfield was terminated because he appropriated, altered, and distributed the "minideal list," is more difficult. In response to Bernardi's claim that it terminated Bloomfield because of this event, Bloomfield disputes whether the minideal list was confidential and whether what he wrote was offensive or improper. He states that he did not believe that the document was confidential because Earle, a manager, was looking at the document with other salespeople, because it was out in the open in a public place, and because it was a summary of information available to all salespeople that Jubb had promised to provide. Bloomfield contends that the markings he put on the document were not intended to have sexual connotations.

Furthermore, Bloomfield has raised the apparently undisputed contention that the words "confidential pay plan supplement" were added to the minideal list at some point between his appropriating, altering and distributing it and Bernardi producing a copy of it for this litigation; thus, an inference can be drawn that Bernardi fraudulently altered the document to bolster its claims that it was confidential.

Bloomfield's argument that the list was not really confidential and did not contain a sexually explicit slur is not really on point for purposes of this motion. The relevant issue is not whether Bloomfield was fairly or legitimately fired for his actions, but whether Bernardi was motivated by its perception of the event to terminate him, fairly or not. Bloomfield must show that Bernardi was lying when it said that it fired him for what he did on November 10. Bernardi has produced credible evidence that Bloomfield was fired because its managers perceived Bloomfield's actions to be destructive to the company. He was fired immediately following the event and the managers immediately linked his termination to his behavior.

However, the evidence Bloomfield has produced—that the company's reaction was disproportionate and unwarranted, particularly if the list was not confidential and if the comments were not really offensive—could, particularly if buttressed by other evidence, be sufficient to support an inference that Bloomfield's behavior was not the true cause of his termination. In addition, the allegation that Bernardi wrote "confidential pay plan supplement" on the document after Bloomfield's termination supports an inference that Bernardi was improperly trying to reinforce the evidence that Bloomfield took a "confidential" document, which in turn supports an inference that Bernardi is trying to hide something.

## D.

█ Bloomfield has offered statistical evidence that the true reason that Bloomfield was fired was his age. Such evidence can support a conclusion that Bernardi discriminated on the basis of age and bolsters his argument that Bernardi's proffered explanations were mere pretext. While this evidence is thin, it is sufficiently suggestive to reinforce Bloomfield's pretext evidence and raise a genuine issue of fact regarding a discriminatory cause for his termination.

In his original opposition to summary judgment, Bloomfield produced the following evidence: an employee roster chart for Bernardi Toyota from 1995–1997 and 1998 and a list of sales professional employed in July 1997, November 15, 1997, and December 1, 1998. From these sources, Bloomfield gleaned that in the nine-month period from June 1997 through February 1998, nine of the eleven salespeople Bernardi hired were under 40 and the two over 40 were each six years younger than Bloomfield. He further noted that in June 1997 six of ten salespeople employed by Bernardi were over forty, whereas in November 1997, after Bloomfield was fired, only five of twelve salespersons were over forty. On December 1, 1998, a year latter, only six of twenty-two salespeople were over 40. Therefore, he argued the proportion of older to younger salespeople changed slightly from June to November 1997, and significantly from November 1997 to December 1998.

Bloomfield has since the hearing on this motion supplemented those materials with a chart of all employees who worked for Bernardi between January 1, 1995 and December 31, 1998, including start date, end date, title, reason for termination, and birth date. From this information, the plaintiff has argued that Bernardi was sig-

nificantly more likely to hire salespeople under 40 than over 40. By his calculation, in the period between June 1, 1997 and February 28, 1998, 9 of 10 salespeople hired were under 40.[5]

In addition, he concludes from the employment chart that 6 of the 14 salespeople over the age of 40 who left Bernardi between January 1 1995 and December 31, 1998 were fired (as opposed to voluntarily quit). Of those salespeople under forty who left, only 9 of 53 were fired. Therefore, salespeople over 40 who left Bernardi were significantly less likely to have done so voluntarily than those under 40.[6]

■ The First Circuit has pointed out that in a disparate treatment context, "statistical evidence . . . , in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee." *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 848 (1st Cir.1993). However, both the First Circuit and the SJC have acknowledged that "statistical evidence" may be admissible in a disparate treatment case to support the inference that the particular employment decision was discriminatory. *See McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 303 (1st Cir.1998); *Lipchitz*, 434

Mass. at 509, 751 N.E.2d 360. As evidence that a proffered reason is pretext for discrimination, statistical evidence in fact may be "highly relevant." *Blizard v. Frechette*, 601 F.2d 1217, 1223 (1st Cir.1979).

■ The First Circuit has, nevertheless, cautioned that statistical evidence may vary greatly in its probative value. *Blizard*, 601 F.2d at 1223. For example, one potential flaw in statistical evidence may arise when the ages of employees are given without any information about the age of the applicant pool. Specifically, "the fact that recently hired [employees] are younger than [the plaintiff] is not necessarily evidence of discriminatory intent, but may simply reflect a younger available work force." *LeBlanc*, 6 F.3d at 848. *See, also, Rodriguez v. Smithkline Beecham*, 224 F.3d 1, 7–8 (1st Cir.2000) (to be probative statistics must be linked to available pool of female applicants); *Blizard*, 601 F.2d at 1224 (same).

Despite the fact that it is very difficult to make anything other than conflicting inferences about the discriminatory animus of Bernardi from the employment statistics Bloomfield has provided, they are arguably suggestive of discrimination. When coupled with the evidence of pretext in two of Bernardi's explanations for Bloomfield's

---

**5.** In the materials originally submitted, as well as in the materials submitted by Bernardi as a supplemental response to Interrogatory 2 (Ex. D), it appears that 2 of 11 salespeople hired between 6/1/97 and 2/28/98 were over forty. James Stuart (45 years old) was hired on 10/7/97 and Daniel Mahnks (45 years old) is listed as hired on 1/23/98. However, an additional chart (Ex. E) lists Mahnks as hired on 11/23/98, which would put him out of the window selected by the plaintiffs. Additionally, of the other 9 salespeople employed in that period, two, Finn and Tchaly, would turn 40 within the year.

The plaintiff's choice of February 28, 1998 as his cut off date, is open to question. If one were to take all the salespeople hired between

6/1/97 and 12/31/98 (the last date for which information is provided), one would come up with a different statistical profile from that plaintiff argues. It appears that of the 38 salespeople hired in that period, 9 were over 40(23%). Thus, after the incident, the defendant continued to hire salespersons over the age of forty in significant numbers. Without any sort of baseline number—for example ages of applicants for the position—in the context of which to place Bernardi's numbers, it is difficult to determine how strongly these statistics support an inference of discrimination.

**6.** I note that these statistics were uncontested by the defendants.

termination, and evidence that may cast into doubt regarding the third reason, plaintiff's opposition has demonstrated that a genuine issue of material fact exists over whether he was terminated on the basis of age. Bloomfield has produced sufficient evidence of discrimination on the part of Bernardi that I will deny the motion for summary judgment.

## IV. Counts II and IV

In his Verified Complaint, Bloomfield alleges two counts that are not mentioned in Bernardi's motion for summary judgment. In Count II, Bloomfield alleges that he was terminated in order to deprive him of the benefit of his employee benefit plan in violation of 29 U.S.C. §§ 1132 and 1140.[7] In Count IV, Bloomfield alleges that Bernardi violated Mass. Gen. Laws ch. 149, § 148 by failing to pay him all the compensation he was due. These counts are outside the scope of the summary judgment motion and so I offer no opinion about them here.

## V. Conclusion

For the reasons set forth more fully above, I hereby DENY Bernardi's motion for summary judgment as to counts I and III.

---

**7.** 29 U.S.C. § 1140 reads in pertinent part: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ...."

29 U.S.C. § 1132 reads in pertinent part: "(a) a civil action may be brought—(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."