Armando **VESPRINI,** Plaintiff,

v.

**SHAW INDUSTRIES, INC.** and Shaw Contract Flooring Services, Inc., Defendants.

No. CIV.A. 00–11311–NG.

United States District Court, D. Massachusetts.

May 3, 2002.

Richard L. Yospin, Simons & Marcus, Brighton, MA, for Armando Vesprini, Plaintiff.

Allison B. Kaplan, Allison K. Romantz, Morgan, Brown & Joy, Boston, MA, for Shaw Contract Flooring Services Inc, Shaw Industries Inc., Defendants.

## MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT

GERTNER, District Judge.

Plaintiff Armando Vesprini ("Vesprini") brings this case under the federal Age Discrimination in Employment Act ("ADEA"), 42 U.S.C. § 621 *et seq.*, the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B ("ch. 151B"), Massachusetts[1] law of breach of contract, and Massachusetts common law of constructive discharge. The case raises important questions concerning the meaning of "direct evidence" of age discrimination—what kinds of comments qualify, by whom, when?

In 1997, Vesprini sold his company, Circle Floors, Inc. ("Circle") to the defendants, Shaw Industries ("Shaw") and Shaw Contract Flooring Services ("SCFS"), and received an Employment Agreement which he believed protected his position and compensation as head of Circle Floors for a three-year period. At the time of the sale Vesprini was seventy-one years old.

The three-year period following that sale, however, was difficult for Vesprini. According to him, after the Circle Floors purchase, and particularly after Shaw merged Circle with another flooring company, Continental, Shaw executives marginalized and humiliated him because of his age. They made comments about his age and limited future with the company, even though he was a vigorous seventy-one-year-old and his company had been successful. After the sale, they refused to give him his due as CEO of Circle Floors, and effectively forced him out of the office. As a result, he claims to have lost bonuses and suffered emotional distress.

---

1. In the Complaint, Vesprini alleges that the defendants are obligated to honor his employment contract "by operation of M.G.L. ch. 156, §§ 46A, 46B, 46C and 46D." However, as discussed further below, the contract contains a forum selection clause that specifies that "[t]his agreement shall be interpreted according to the laws of the state of Georgia."

The defendants tell a different story: Shaw purchased Circle with an eye to integrating it into a larger network of flooring contractors. Consistent with this plan, Vesprini's employment contract was a short-term one, only three years in duration. As in the case of any purchase of an ongoing business, the old employees had to adjust to the new regime. Vesprini simply refused to acclimate to his necessarily more limited role as part of a larger organization or to take direction from Shaw. His failure to adapt to the changes gave rise to employee complaints that Shaw executives could not ignore, culminating in an episode in which Vesprini used profanity and was disruptive. Even then, Shaw did not formally terminate him or invoke the punitive provisions of the contract: They just let his contract run out.

Defendants have moved for summary judgment, claiming that Vesprini has failed to create a triable issue of material fact as to any of his claims. For the reasons stated below, Defendants' Motion for Summary Judgment [docket entry # 29] is hereby **GRANTED.**

## I. *FACTUAL BACKGROUND*

The following are the facts, viewed in the light most favorable to Vesprini: Vesprini opened and incorporated Circle Floors, Inc. ("Circle Floors"), a commercial flooring business, as its president and sole shareholder in 1960. His son, Michael Vesprini ("Michael"), came to work for Circle Floors in 1985, and Vesprini eventually made Michael a vice president of the company; in 1996, Vesprini gave Michael 40% of the company's shares.

Also in 1996, Jay Houston ("Houston"), on behalf of defendant Shaw, approached Vesprini to inquire as to whether he would be interested in selling Circle Floors to Shaw. Both Vesprini and his son testified that they understood that the sale would have little to no impact on how they ran the business; Shaw told them that they would be allowed to continue conducting what had been a profitable and successful business in the same manner as before. Accordingly, Vesprini and Houston eventually agreed on a purchase price of approximately $7.2 million, to be paid in the form of Shaw stock, and the sale was concluded in early April 1997. At the time of the sale, as discussed above, Vesprini was seventy-one years of age.

On April 4, 1997, Vesprini entered into an Employment Agreement with Circle Floors, now owned by Shaw. The agreement provided that Vesprini would be employed as president of Circle Floors for a period of three years, or until April of 2000. It also provided, inter alia, that Vesprini would be paid annual compensation of $207,000; that he would be eligible to participate in the normal benefit programs of Circle Floors, in accordance with the terms and requirements of each plan or program; and that he would also be eligible to receive an incentive bonus payment in accordance with a bonus plan currently in effect and attached to the agreement.[2]

The agreement did not enumerate Vesprini's duties with any specificity. All it said was that during his three-year term of employment, Vesprini "shall devote his entire time and effort, during assigned working periods, to the tasks Circle shall assign him." The Agreement also contained a covenant not to compete, which provided

---

**2.** The Bonus Agreement provided that bonuses would be distributed to the employees of Circle Floors "at the discretion of the President of the company." The total amount of money available to be allocated as bonuses, or "bonus pool," was to be calculated by a formula set out in the bonus agreement, based on annual revenue, pretax income, and gross margin.

that Vesprini would not engage in business activities competitive with Circle Floors during the period of his employment by Circle.

Finally, the Employment Agreement contained provisions regarding termination. Specifically, it provided that Circle Floors had the right to terminate Vesprini prior to the termination of the three-year contract, either for good cause[3] or otherwise. If Vesprini were to be terminated for good cause, he would forfeit all rights to any further compensation, payments, or benefits under the contract, and Circle would have no further obligations under the contract. If Circle were to terminate Vesprini for reasons other than good cause, however, Vesprini would be entitled to continue to receive his base salary, but not the bonus for the fiscal year (or portion thereof) during which the termination occurred.

In addition to the Employment Agreement and the attached Bonus Agreement, Vesprini later signed a Standards of Ethical Conduct Agreement.[4] This agreement provided, in relevant part, that "[a]ny use of vulgar or unprofessional language on company premises or at any time while engaged in the performance of company duties is strictly prohibited," and that "failure to abide by this Agreement may be grounds for the termination of my employment without any further notice and without any requirement for progressive discipline."

From Shaw's perspective, the Circle Floors acquisition was only one part of a larger plan to acquire commercial flooring businesses in the Boston area, with a view to building up a national network of flooring contractors that would function on a region-by-region basis. In 1997, Houston hired 41–year–old Scott Mahan ("Mahan") to, inter alia, analyze the Boston flooring market and assess how Shaw should proceed. After spending some time on research in the Boston area, Mahan reported that there was counterproductive competition between two flooring companies that Shaw had acquired: Circle Floors, the company employing Vesprini, and Continental Carpets ("Continental"), which it had purchased around the same time. Accordingly, sometime in the fall of 1997, Shaw assigned Mahan the task of overseeing the merger of the two companies, along with Shaw's regional mill-based operation. That merger plainly had the potential to affect the responsibilities of employees in each company, including Vesprini.

In October 1997, Vesprini and his son, Michael, were invited to attend a meeting at Shaw's headquarters in Dalton, Georgia, at which Mahan and Houston were also present. The meeting is significant for Vesprini because of what he claims was said to him about his role. Houston informed Vesprini and his son about the forthcoming merger between Circle Floors and Continental. Houston explained that Mahan would come to Boston to serve as the president of the consolidated business, Shaw Contract Flooring Services/New England ("SCFS/New England"), and would be responsible for its day-to-day operations, that Michael Vesprini would serve as its vice president, and that Ves-

---

**3.** The Employment Agreement specified the following reasons as "good cause": (a) Any medical or other condition which would materially impair Employee's ability to perform his duties; (b) Dishonesty; (c) Employee having engaged in a conflict of interest with Circle; (d) Breach of this Agreement; (e) Employee's refusal to perform the duties assigned to him; or (f) Conviction of Employee of a crime involving moral turpitude.

**4.** The date on the Standards of Ethical Conduct Agreement is October 17, 1997.

prini would continue to serve as Chief Executive Officer of Circle Floors.

The parties agree that Houston told Vesprini that he envisioned Vesprini's role as that of a mentor/advisor to Michael and Mahan, helping them to learn the business and providing them with the benefit of his years of experience and contacts. Vesprini and Houston also agree that, when Vesprini asked Houston to clarify who would be "the boss," Houston told him repeatedly that he, Vesprini, would be.[5]

The parties disagree, however, as to what else was said. Specifically, Vesprini claims that in the course of describing his new role as mentor to Mahan and Michael, Houston told him, that he should step back and "let the young stallions run the business" and that it was "time to smell the flowers". Vesprini also claims that Houston and Mahan told him that he was "not going to be here much longer," and that they suggested that he spend more time at his house in Florida[6] "taking it easy" and playing golf. Houston and Mahan testified that they did not recall making these statements. Vesprini testified that he interpreted these comments as not-too-subtle hints that he should retire because of his age.

In the period of time between this meeting and January 1998, the defendants claim that various Shaw employees reported complaints and rumors regarding Vesprini to Mahan, including allegations that Vesprini was speaking negatively about Shaw and Mahan, that he was interfering with the Continental merger, and that he had told various sales people, vendors, and customers that he was considering opening up his own business to compete with Shaw. Mahan reported these problems to Houston. Vesprini offered nothing in rebuttal.

But Vesprini does agree that he was critical of Mahan's administration. At some point in December 1997, Vesprini confronted Mahan, faulting him for several of his business decisions. Mahan responded, "Jay Houston lied to you when he said you're the boss. I'm the boss." Vesprini, apparently not shy about his opinions, decided to take this issue up at a meeting with Houston and other Shaw executives scheduled for January in Boston. Meanwhile, on December 17, 1997, he sent Mahan a letter requesting "copies of your correspondence on issues regarding sales, operations interrogations and other changes you are or may be contemplating."[7]

By the time of the Boston meeting, which took place at Logan Airport on January 22, 1998, Vesprini testified that all of his previous duties and responsibilities had been taken over by Mahan. When Vesprini brought up the issue of who was in charge, Hal Long ("Long"), executive vice president of SCFS, responded, "Scott Mahan is the boss. You answer to him. End of story." Vesprini testified that, despite the fact that Long made no explicit refer-

5. At least, the parties agree that Vesprini asked the question and that Houston told him that he would be "the boss." Houston, in his deposition, indicated that he told Vesprini that "he would be the boss of Shaw Circle." Houston Deposition, at 54. Vesprini just indicates that he was told that he would be "the boss," without reference to any particular entity. Vesprini Deposition, at 71. Thus, insofar as the parties may have contemplated that Vesprini would be "the boss" of different entities—i.e., the former Circle Floors versus SCFS/New England—then they of course do not agree as to the import of what was said.

6. Vesprini did in fact own a house in Florida, and he testified that he went there two or three times a year for about a week at a time.

7. It is unclear from the deposition testimony whether the letter or the conversation with Mahan occurred first; however, both occurred sometime in December 1997.

ence to his age, Vesprini felt that age-related animosity motivated the statement:

Q: [W]hy do you believe that that comment demonstrated animosity against you on the basis of your age?

A: Well, you know, it had to be sort of animosity in his voice. He couldn't say that to me because of my performance because my performance was on a very high level, so I just assumed that.

\* \* \* \* \* \*

A: And then I said this changes the whole rule of the ball game for me. I want to talk to my lawyer, because I had been under the apprehension that they elevated me from president to C.E.O., that I had the final say.

Vesprini also testified that he more or less concluded the meeting by saying, "I've got nothing further to say. This now is going to be in the hands of my attorney." *Id.* at 113.

On February 10, 1998, Houston wrote Vesprini a letter in which he explained:

... The essential duties of your job have not changed. Your compensation has not changed. You are the Chief Executive Officer for Shaw/Circle Floors.

Scott Mahan is responsible for Shaw/Circle Floors, Shaw/Continental Carpets and other direct sales functions in the Boston area. While you may be reporting to Scott, you are still the person I look to run Shaw/Circle Floors. Mandy, you have a wealth of knowledge and experience about the Boston market. My hope is that, by relieving you of some of the more mundane operational responsibilities, you will have the time to become a needed mentor to both Scott [Mahan] and Michael. I need you to train the next generation of leaders in the Boston market. I need you to be fully involved and fully participating in developing the Boston market.

Thereafter, between February 1998 and November 1999, Vesprini continued to go into work on a daily basis, but he testified that he had little to do there and was "embarrassed to go to the office"; although people occasionally asked his advice on various questions, he had "no authority" and "no responsibilities."

In July 1998, SCFS/New England relocated to Woburn. Mahan testified that he spoke to Vesprini before the move and asked him what kind of office he wanted in the new building and where he wanted it to be located, and that Vesprini responded that he did not care; Vesprini does not recall any such conversation. Vesprini's new office was small, with no window and no lock on the door; he testified that he felt that it "wasn't consistent with an office for a chief executive officer." When asked whether he had ever voiced any complaints about his new office, Vesprini responded that he had not. Vesprini also did not object when he was not provided with new business cards after the move; he testified that, although he assumed it was an "oversight," he did not say anything because he felt that he had "that little interaction, that little authority that when I think of it, it was just nothing."

In the fall of 1999, Mahan took a leave of absence from work due to a serious health condition. Houston began to receive telephone calls from SCFS/New England employees complaining about various problems in the SCFS/New England office The complaints painted a picture of a stress-filled and unhappy workplace, for a variety of reasons including "confrontation," "cursing," "moral problems," and "turmoil," in part because of Vesprini. Accordingly, in October 1999, Houston traveled up to Boston to investigate the situation; he met with Vesprini, but did not confront him

about any of the complaints. Again, Vesprini does not offer evidence suggesting that Houston did not receive these complaints at that time.

After Houston had returned to Georgia, on October 27, 1999, an new incident came to his attention. Several SCFS/New England employees, including Suzanne Grubis ("Grubis"), a sales manager, and Paul Ritzel ("Ritzel"), Director of Operations, overheard Vesprini and Michael having a loud conversation about Grubis in Michael's office; Grubis and Ritzel heard Vesprini tell Michael, inter alia, that "that Suzanne Grubis is going to fuck you!" Vesprini acknowledges that the conversation with his son occurred and that he referred to Grubis in an "uncomplimentary" way; he testified that he might have used profanity in that conversation, although he wasn't sure whether he had done so or not.

After overhearing the conversation between Vesprini and Michael, Grubis went to Ritzel's office; visibly upset by what she had heard, she related it to Ritzel. Ritzel then approached Vesprini and Ritzel, Grubis, and Vesprini met in Ritzel's office to discuss what Ritzel and Grubis had overheard.

Vesprini admits that at one point during the meeting, he "lost his cool," "was quite furious," and both raised his voice and directed profanity [8] at Ritzel, although he denies that he would ever have directed profanity at Grubis. As to the substance of what was discussed, Vesprini testified, in part, as follows:

> [Ritzel] started in on me saying, "You shouldn't talk like that. It's detrimental," this and that. He went into this long dialog about how it's detrimental to the company to talk about employees.

I said, "Paul, I don't know what I said. It's just a conversation that, if she was listening, I have no idea what she heard." And then I kind of lost my cool, I'll admit, at him, because I recommended him for the job and he was supposed to be running Circle Floors. He had a lot of the authority that I had had, which I should have had, which was just kind of running and planning the whole thing of how to run the company.

\*      \*      \*      \*      \*      \*

I've had men work for me 25 years, one 39 years, and I just felt at that moment—this is when we had moved in and had all of these fancy—I said, "Paul, you should be out getting work to keep your men going, and you're looking around at the pictures on the wall." I lost my cool.

As to the problems with Grubis and Michael, Vesprini's testimony reflects that he disagreed, at least in part, with the way Ritzel was allocating accounts between Grubis and his son. (Assigning accounts to sales managers was previously one of Vesprini's duties.)

After this meeting ended, Ritzel and Grubis reported the incident to Shaw's corporate headquarters, and Ritzel followed up with a written memorandum. On November 1, 1999, three SCFS executives—Houston, Tim Baucom, and Susan Bramblett—flew up to Boston to meet with Vesprini. Under the terms of Employment Agreement, assuming Shaw had decided to terminate Vesprini, Shaw had two alternatives. It could have claimed good cause for Vesprini's termination, based on his use of profanity in the office (a violation of the Standards of Ethical Conduct Agreement), and then paid him

---

8. Vesprini's version of the profanity is that he called Ritzel a "son of a gun" and told him to stop looking at "the God damn pictures" on the wall, although he may have told Ritzel he was "full of bullshit"; he doesn't remember his exact words. Ritzel's recollection, as recorded in a memorandum he wrote on the evening of October 27, is decidedly more colorful.

no further compensation or bonus; or, it could have terminated Vesprini without good cause, and paid him compensation through the end of the contract term but no bonus for the fiscal year in which the termination occurred (or thereafter).

Houston did neither. Rather, he asked for Vesprini's resignation and represented that Shaw would pay Vesprini his salary through the term of his employment contract.[9] Further, Houston requested that Vesprini no longer appear on the premises of SCFS/New England. Vesprini refused, and informed Houston that he would be consulting his lawyer.

After hearing reports that Vesprini was continuing to come into the office after November 1, Houston sent Vesprini a letter dated November 11, 1999. Again, Houston did not terminate Vesprini's contract. Rather, Houston's letter outlined Vesprini's minimal duties through the expiration of his contract, which then was only months away:

1. You will report directly to me. Any questions you have about your employment are to be directed to me.

2. You will not have any day-to-day responsibilities at SCF/New England. You will be available for consultation as needed and reasonably requested.

3. No one at SCF/New England will report to you.

4. You will not maintain regular hours at SCF/New England. In fact, as we ease through this transition period, you will not be in the SCF/New England offices except when we have discussed the need to have you there.

5. You will be available to me, on a reasonable basis, to consult and advise

me on matters affecting other SCF operations in different parts of the country.

6. You will during this remaining period use your best efforts to transfer your good relationship with the union labor to Michael Vesprini.

After November 11, 1999, Vesprini's presence was never again requested at SCFS/New England. By April 2000, the terms of the Employment Agreement expired.

On December 17, 1999, Vesprini filed suit with the Massachusetts Commission Against Discrimination ("MCAD"). On June 7, 2000, Vesprini filed the present action in the Superior Court Department of the Massachusetts Trial Court for Middlesex County.[10] Since Vesprini was paid his salary in full through the term of his employment contract, this lawsuit concerns certain bonuses that Vesprini claims he is owed and damages for emotional distress.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standard

Summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In assessing a motion for summary judgment, I am required to view the facts in the record in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42 (1st Cir.1999), *cert. denied*, 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000). *See also Celotex*

---

9. Houston presented Vesprini with two documents: a pre-drafted resignation letter from Vesprini to Houston, and an unsigned Separation Agreement and Release.

10. On July 5, 2000, the defendants removed the case to federal court on both diversity and federal question grounds. (Vesprini is a citizen of Massachusetts; the defendants are Georgia corporations with their principal places of business in Dalton, GA.)

*Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Discrimination claims, however, pivot on issues which are quintessential jury questions, like motive or intent. Nevertheless, in rare cases summary judgment may be appropriate "if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). In my judgment, this is such a case.

### B. *Count I: Age Discrimination Claims*

#### 1. *Statute of limitations issues*

■ Vesprini complains about statements and acts over the course of the three-year contract, from 1997 through 1999. Defendants allege that any claims prior to February 1999 are time-barred.

I agree with the defendants that the 1997 and 1998 claims are not independently actionable.[11] Under the ADEA, a plaintiff must file his discrimination charge with the appropriate administrative agency within 300 days from the occurrence of the alleged unlawful practice. 29 U.S.C. § 626(d)(2). The 300–day period begins to run "when a plaintiff knows, or has reason to know, of the discriminatory act." *Melendez–Arroyo v. Cutler–Hammer de P.R. Co.,* 273 F.3d 30, 37 (1st Cir.2001). The same rationale applies to employment discrimination claims filed under ch. 151B; however, the limitations period is six months. Mass. Gen. Laws ch. 151B, § 5; *Williams v. Raytheon Co.,* 220 F.3d 16, 20 (1st Cir.2000) (statute of limitations under ch. 151B began to run when employee found out that employer had decided to terminate him).

Vesprini filed his charge of discrimination with the MCAD on December 17, 1999. Accordingly, for statute of limitations purposes, Vesprini would have had to become aware of any alleged discriminatory acts no earlier than June 17, 1999 for ch. 151B purposes, and no earlier than mid-February 1999 for ADEA purposes. As such, any claims for damages based on the events of 1997 and 1998 are time-barred.

Vesprini responds that the incidents that form the basis for this lawsuit should be viewed as a "continuing violation."[12] Under the continuing violation doctrine, as long as at least one alleged act of discrimi-

---

**11.** In the end, however, the fact that these claims are time-barred may well be a distinction without a difference. The 1997 and 1998 claims are problematic in a number of respects. First, they involve emotional distress damages only; Vesprini agrees that there were no economic consequences attached to the events of those years. Since Vesprini continued to be paid his salary during those years, and does not challenge the bonuses he received during that time (he chose not to give himself one in 1997, and in 1998 a diminution in the business resulted in a modest bonus), his only claim has to be something akin to harassment on account of his age and the emotional distress resulting from it. In effect, they are hostile work environment claims.

As a matter of law, hostile work environment claims based on age are available both in this Circuit and elsewhere. *See, e.g., Rivera–Rodriguez v. Frito Lay Snacks Caribbean,* 265 F.3d 15, 24 (1st Cir.2001) ("Hostile-work-environment claims were first recognized in the sex-discrimination context, but have since been recognized for members of any protected class."); *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 317 (2d Cir.1999) (citing *Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 834 (6th Cir.1996)). Vesprini, however, did not explicitly raise these claims as hostile work environment claims. As a result, he has not made the kind of factual showing required to survive summary judgment on an age-based hostile work environment claim. *See Rivera–Rodriguez,* 265 F.3d at 24.

**12.** The courts have recognized two types of continuing violations: systemic violations, which stem from discriminatory practices or policies directed at a class of employees with

nation is timely, a plaintiff can recover for other, untimely acts so long as he can prove a "substantial relationship" between the timely and untimely acts. Mass. Regs. Code tit. 804, § 1.10(2); *O'Rourke v. City of Providence*, 235 F.3d 713, 731 (1st Cir. 2001); *Sabree v. United Bhd. of Carpenters and Joiners*, 921 F.2d 396, 401 (1st Cir.1990). However, even a continuing violation theory will fail "if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place." *Provencher*, 145 F.3d at 14 (citing *Sabree*, 921 F.2d at 401–02). The rationale is clear: The knowing plaintiff has an obligation to file promptly or lose his claim, as compared to the plaintiff who is "unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern." *Sabree*, 921 F.2d at 402.

Vesprini's position with regard to this issue is flatly inconsistent with his position on other aspects of this case. On the one hand, for statute of limitations purposes, he tries to argue that he did not know about the defendants' discriminatory acts in 1997 and 1998, and therefore could not have sued based on them. On the other hand, to buttress his age discrimination claim, he points to the defendants' acts and comments in 1997 and 1998 as so clear as to amount to direct evidence of discrimination. Plainly, if Vesprini's accounts of his encounters with Houston are to be credit-

ed, he was well aware that age-biased statements had been made by October 1997, and further, that his authority was being challenged by December of 1997.[13]

■ Alternatively, Vesprini argues that the statutes of limitations should be equitably tolled because the defendants affirmatively misled him as to their actions and thereby lulled him into inaction. *See, e.g., Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 752 (1st Cir.1988) (holding that doctrines of equitable tolling and equitable estoppel may defeat statute of limitations in ADEA cases). This argument, too, must fail. Equitable estoppel and equitable tolling doctrines involve employee ignorance of statutory rights that the court deems "excusable" under the circumstances. *Kale*, 861 F.2d at 752; *Commonwealth of Mass. v. Bull HN Info. Sys., Inc.*, 143 F.Supp.2d 134, 156 (D.Mass. 2001). However, even where employer misconduct plays a part in the excusable ignorance of the affected employee, a valid equitable tolling claim only exists to the point that "the employee receives notice of his statutory rights *or retains an attorney.*" *Kale*, 861 F.2d at 752 (emphasis added).

Vesprini has not even attempted to claim that he was ignorant of his statutory rights not to be discriminated against on the basis of age. In fact, claiming age discrimination was his first reaction to what he believed to be the defendants' shabby treatment of him. At the Logan Airport meeting in January 1998, Vesprini

---

regard to hiring, promotion, compensation, or training, and serial violations, i.e., "a chain of similar discriminatory acts emanating from the same discriminatory animus ... that amount to unlawful discrimination upon their repetition or escalation." *Provencher v. CVS Pharmacy*, 145 F.3d 5, 14 (1st Cir.1998). Here, the plaintiff appears to argue, appropriately, that the alleged continuing violation is of the serial rather than the systemic variety. Accordingly, for the purposes of this discus-

sion, I will focus solely on the serial continuing violation doctrine.

13. In October, Houston supposedly told him to "step back and let the young stallions run the business" and that he was "not going to be here much longer," and suggested that Vesprini spend more time playing golf in Florida. In December, Mahan told him: "Jay Houston lied to you when he said you're the boss. I'm the boss."

stated unequivocally—and not for the first time—that he would be taking up the issues discussed at the meeting with his attorney. Moreover, even if Shaw were in fact trying to mislead Vesprini by telling him he was "the boss," it is clear that, by February 1998, Vesprini knew better. He claimed that by that time he had "no responsibilities" at work.

Accordingly, I find that Vesprini may only recover, if at all, for those events occurring after mid-February 1999 with regard to the ADEA, and for those occurring after June 17, 1999 with regard to the ch. 151B claim. However, whether independently actionable or not, the 1997 and 1998 statements and acts may be used as evidence bearing on the motivation of the defendants in the actionable time period.[14]

### 2. Substantive issues [15]

The core actionable claim involves Vesprini's final ouster from the company's premises in November 1999, and his claim for bonuses and emotional distress.[16]

#### a. Mixed-motive or pretext?

The case law establishes that there are two paradigms for discrimination claims, although the lines between the two are not always so clear: pretext and mixed-motive.[17] In a pretext case, the plaintiff alleges that he was discriminated against

14. *See, e.g., United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (observing that "[a] discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences."); *Sabree,* 921 F.2d at 400 n. 9; *Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d 568, 572–73 (8th Cir.1997) (evidence of incidents of sexual harassment that occurred outside statutory period admissible to establish hostile work environment); *Kline v. City of Kansas City Fire Dep't,* 175 F.3d 660, 664 (8th Cir.1999) ("Even if a plaintiff is unable to show a continuing violation, ... instances of harassment occurring outside the [limitations] period may be admissible to provide relevant background to later discriminatory acts") (citing *Rorie v. United Parcel Serv., Inc.,* 151 F.3d 757, 761 (8th Cir.1998)); *Runyon v. Mass. Inst. of Tech.,* 871 F.Supp. 1502, 1509 (D.Mass.1994).

15. As this Court and the First Circuit have observed, the standards of liability and proof for age-discrimination claims arising under the federal ADEA and Mass. Gen. Laws ch. 151B, § 4 have generally been held to be the same. *E.g., Villanueva v. Wellesley College,* 930 F.2d 124, 127 n. 2 (1st Cir.1991); *Bloomfield v. Bernardi Automall Trust,* 170 F.Supp.2d 36, 40 (D.Mass.2001); *but see*

*Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 n. 3 (1st Cir.1993) (declining to address plaintiff-appellant's argument that ch. 151B carries a less onerous standard of proof than the ADEA because argument was raised for the first time on appeal); *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 829 n. 11 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992) (same). In the present case, both parties have treated the standard of proof regarding both claims as the same, and they have made no distinction between the statutes in their briefs. Accordingly, for the present purposes, I will assume that the standard of proof required to survive summary judgment is the same for both the federal and the state age discrimination claims.

16. In addition, to the extent that Vesprini complains about comments and actions taken in the limitations period, he is raising a "hostile environment" claim that he did not explicitly plead much less address in these summary judgment papers, as discussed above.

17. There are scholars who have taken the position that the two paradigms are essentially one—the plaintiff's proof that animus motivated the adverse decision, and the employer's defense that the decision would have been the same even without the animus. *See, e.g.,* Benjamin C. Mizer, *Towards a Motivating Factor Test for Individual Disparate Treatment Claims,* 100 Mich. L.Rev. 234 (Oct.2001).

essentially on the basis of his membership in a protected class. In a mixed-motive case, the plaintiff alleges that discrimination was among the reasons for the adverse employment decision, but not necessarily the sole reason. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Scott v. Sulzer Carbomedics, Inc.*, 141 F.Supp.2d 154, 170–71 (D.Mass.2001).

It should be noted, at the outset, that the mixed-motive paradigm was an advance in employment law—a recognition that motivation is complex and that it is rare for an employer to be entirely motivated by bias, or entirely free of it. Rather, it is more likely that an employer will have parallel motivations—some lawful, some unlawful.[18] The task of the litigation is to sort out whether the lawful motives predominate: namely, whether the adverse decision being challenged would have been the same absent the unlawful motive.

The characterization of the claim, in turn, affects the allocation of the burdens of proof. In the pretext approach, the burdens of production are allocated according to the familiar *McDonnell Douglas* three-stage "pretext" analysis; the burden of persuasion remains with the plaintiff throughout.[19] In a mixed-motive case, once a plaintiff adduces sufficient evidence that an illegitimate factor played a substantial role in a particular employment decision, the burden of persuasion then shifts to the employer to prove affirmatively that it would have made the same decision even if it had not taken the protected characteristic into account. *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 580 (1st Cir.1999) (citing *Price Waterhouse*, 490 U.S. at 242, 244, 109 S.Ct. 1775).

### i. Mixed-motive approach: sufficiency of evidence

In order to proceed under the mixed-motives approach, the plaintiff has a threshold requirement to meet: He has to demonstrate that impermissible factors were in fact in the "mix" of the employer's motives. Most courts have characterized this as the requirement that the plaintiff adduce some quantity of "direct" evidence of discrimination. *E.g., Kirk v. Hitchcock Clinic*, 261 F.3d 75, 78–79 (1st Cir.2001); *Costa v. Desert Palace, Inc.*, 268 F.3d 882, 886–88 (9th Cir.2001) (so holding, and citing case law from every other circuit). However, there is less consensus as to (1) what constitutes "direct" evidence and (2) how much of it is required to allow a mixed-motives plaintiff to proceed.[20]

---

18. *See* Mizer, *supra* note 17, at 241.

19. First, the plaintiff must establish a prima facie case of discrimination: he must prove that he (1) was at least 40 years of age; (2) met the employer's legitimate job performance expectations; (3) experienced adverse employment action; and (4) was replaced by a younger person with roughly equivalent job qualifications. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993). The burden of production then shifts to the defendant to advance a legitimate reason for its employment decision; and finally the burden shifts back to the plaintiff to prove that the proffered reason was in fact a pretext for discrimination. *See Ayala–Gerena v. Bris-* *tol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

20. At least one court has suggested that the distinction between direct and circumstantial evidence in this context is really a question of quantity, not type, of evidence; therefore, a sufficient quantity of circumstantial evidence could suffice to sustain a mixed-motive claim. *Costa*, 268 F.3d at 888 n. 3. This analysis is consonant with my own understanding, and reflects the fact that the adjective "direct" is really being used in two distinct ways in the mixed-motive context: (1) direct as in direct vs. circumstantial evidence, and (2) direct as in sufficiently strong to meet the mixed-motive evidentiary threshold. However, this is-

Three schools of thought have emerged: the "classic" position, the "animus plus" position, and the "animus" position. *Fernandes,* 199 F.3d at 582. The classic definition adopts the definition of direct evidence from the rules of evidence: It is evidence that "if believed, suffices to prove the fact of discriminatory animus without inference, presumption, or resort to other evidence." *Id.* The "animus plus" definition, the most stringent, requires that the evidence, whether direct or circumstantial, "(1) reflect directly the alleged discriminatory animus *and* (2) bear squarely on the contested employment decision." *Id.* (emphasis added). Finally, the "animus" definition omits prong 2 from the "animus plus" definition, and simply requires that the evidence be directly reflective of the discriminatory animus at issue. *Id.*

In *Febres v. Challenger Caribbean Corp.,* 214 F.3d 57, 60–61 (1st Cir.2000), the First Circuit employed the most rigorous test, the "animus plus" standard, citing back to *Fernandes,* 199 F.3d at 583. *See also, e.g., Melendez–Arroyo,* 273 F.3d at 35; *Kirk,* 261 F.3d at 79; *Sulzer Carbomedics,* 141 F.Supp.2d at 171. Even so, I find that Vesprini has met the requirements of the "animus plus" test here.

The "animus plus" standard cannot be interpreted so stringently as to mean that a plaintiff has to definitively prove the ultimate facts—that there was a discriminatory animus, and that it controlled the employer's decisions. Such an approach would gut the mixed motive paradigm entirely. (In effect, in order to be allowed to prove a "mixed motive," the plaintiff would

have to bear the burden of proving as much as, if not more than, a plaintiff claiming a single motive.) Moreover, this concern is particularly acute where the issue is raised on summary judgment, when I am obliged to take all inferences in favor of the non-moving party—here the plaintiff.

As described above, Vesprini claims that various Shaw employees told him at the outset of the contract (1) that he should step back and "let the young stallions run the business," (2) that it was "time to smell the flowers," (3) that he was "not going to be here much longer," and (4) that he should spend more time at his house in Florida "taking it easy" and playing golf. Vesprini's version of these remarks also makes sense in the context of Vesprini's dealings with Shaw. In fact, the comment that Vesprini should be a mentor to the younger employees, which all parties concede, is not really all that different from the challenged remarks. The defendants could well have meant, as Vesprini took it, that Vesprini, at age seventy-one, was not really fit for the job any more, and that he was on his way to retirement. References to "young stallions" or Florida, home of many retirees, were not gratuitous. The same information—that Vesprini should train others—could have been communicated in age-neutral language. Alternatively, the defendants could have meant that Vesprini, like the proprietor of any company taken over by another, old or young, was bound to have a limited useful life in the newly constituted company. He was supposed to impart his wisdom to the other employees over the three-year contract, and then move on.[21]

---

sue need not be decided here, because, as I discuss below, I find that Vesprini has in fact adduced direct evidence of age-based discrimination.

**21.** Defendants point to the timing of the "young stallions" remark, while Houston was in the middle of explaining to Vesprini that his son Michael would be serving as vice

president and Mahan would be learning the ropes as head of SCFS/New England, and that Vesprini's experience and mentoring skills were very much needed in order to train the two younger men. Likewise, Houston's statement to Vesprini that "Mandy, you are not going to be here much longer" could very well have meant just that: that a new generation would eventually be taking over the reins,

Taking these statements at face value, as I must for summary judgment purposes, no leap of inference would be required for a factfinder to conclude that they reflect age-based animus against Vesprini, and that they bear directly on the contested employment decision in terms of content, timing, and who the speakers were—i.e., the very decisionmakers in Vesprini's case: Houston and Mahan. The context of the remarks also relates directly to Vesprini's continued employment at Shaw; they were made in connection with a discussion of Vesprini's responsibilities vis-à-vis other employees. Vesprini's fitness to lead the company was a continuing theme. While some of these remarks were made a year or two before the actionable period, in 1997 and 1998, in the setting of this case that was not a long time before the critical acts of November 1999. The contract was, after all, only three years long.

### ii. *"Ambiguity" or "Stray Remarks"*

Defendants claim that the statements in question are "ambiguous," and that they therefore cannot qualify as direct evidence of discrimination under *Febres*. This argument confuses the summary judgment standard with the standard for direct evidence under the mixed motive paradigm. Any statement from which a factfinder can take multiple inferences is arguably "ambiguous." "Ambiguity" of that sort means the *defeat* of the defendants' motion for summary judgment. Because I am obliged to take such inferences in the light most favorable to the non-moving party, if one of those multiple inferences, standing alone, is sufficient under *Febres*, a mixed-motive analysis is triggered.

To take a hypothetical example, say that an employer makes the following remark to an employee: "I am firing you because you're old and useless." When the em-

ployee is fired and sues, claiming age discrimination, the employer responds by saying that the statement was a joke and proffers evidence to that effect. There are at least two inferences the factfinder can draw from the statement, if believed. He or she can conclude that a subsequent firing is motivated by a discriminatory animus, as plaintiff contends. Or, he or she can conclude that the remark was not serious. Which the fact finder ultimately accepts will depend upon evidence of factors such as tone and context.

Under such circumstances, I would make two rulings: that the plaintiff has offered direct evidence of discrimination, based on one set of inferences, and that summary judgment, assuming no other evidence, is also inappropriate. Although there is a second set of inferences—that the employer was joking—on summary judgment I would have to disregard them.

Labeling the contested statements "stray remarks" likewise confuses summary judgment analysis and mixed-motive analysis. In early Title VII jurisprudence, courts addressed the question of whether the statements a defendant made about the protected group, other than at the moment of the employment decision, were relevant to determine discriminatory animus. Courts concluded that such statements were relevant; they were, in effect, windows into the attitudes of the employer. *See, e.g., Sennello v. Reserve Life Ins. Co.,* 872 F.2d 393, 395 (11th Cir.1989) (holding that slurs made by employer in the workplace, but not in direct demotion/termination context, were direct evidence of discriminatory motivation in employment action); *Mullen v. Princess Anne Volunteer Fire Co.,* 853 F.2d 1130, 1133 (4th Cir.1988) (holding that use of racially offensive remarks by decisionmak-

that Vesprini, like anyone else, was not going to live forever, and that they needed to train

the younger employees to take over the business.

er "is relevant as to whether racial animus was behind the membership decision .... Racial slurs represent the conscious evocation of those stereotypical assumptions that once laid claim to the sanction of our laws. Such language is symbolic of the very attitudes that the civil rights statutes are intended to eradicate."); *Anderson v. Group Hospitalization, Inc.*, 820 F.2d 465, 472 (D.C.Cir.1987) (observing that a sudden change in an employee's competence ratings "could reasonably give rise to an inference of racial animus, particularly in view of [the supervisor's] predilection for making comments pertaining to race"); *Warren v. Halstead Indus., Inc.*, 802 F.2d 746, 753 (4th Cir.1986) (holding that evidence of a "general atmosphere of discrimination," harassment, or threats is "relevant to the determinations of intent and pretext"); *Carter v. Duncan–Huggins, Ltd.*, 727 F.2d 1225, 1231, 1233 (D.C.Cir. 1984) (rejecting the "propositions that proof of discriminatory treatment and proof of discriminatory animus are completely unrelated," and finding probative of discriminatory animus that the company president was present during the narration of an overtly racist joke "and found the joke humorous"); *Harris v. Marsh*, 679 F.Supp. 1204, 1287 (E.D.N.C.1987) (holding that "evidence of racial slurs or threats, though not the subject of a distinct claim, is relevant to the determination of pretext and intent").

As these courts recognized, a fact finder could well conclude that an employer who made disparaging stereotypes about blacks or demeaning generalizations about women or older people was likely to act on those attitudes. These remarks were not "stray" in the sense that they were irrelevant to the determination of animus—a notion that, even in a post-*Price Waterhouse* world, some courts have continued to recognize. *See, e.g., Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (holding that it was error for the Fifth Circuit to disregard

evidence of age-related slurs just because they "were not made in the direct context of Reeves's termination"); *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir.1990) ("All [the stray remarks cases] really stand for is the common-sense proposition that a slur is not in and of itself proof of actionable discrimination, even if repeated. The remark taken to be a slur may have been innocent and misunderstood; or it may have had no consequence, either because it did not reflect the thinking of the people with decisionmaking authority or because it did not motivate even the person uttering it to act on it. It thus may fall far short of establishing a prima facie case. Even so, it may be relevant evidence, with greater or less probative value depending on the precise character of the remark."); *Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 55 (3d Cir.1990) (holding that a jury could have found that the employer's use of a slur, "old dogs won't hunt," indicated a bias against older employees).

What, then, does "stray remarks" mean in connection with the test for the mixed-motive approach? Does it mean that these remarks, although plainly relevant to the discriminatory animus in general, are not so closely tied to the challenged acts that they meet the "animus plus" test of *Febres*? Carried to its logical conclusion, the "stray remarks" approach would require that the plaintiff prove the ultimate question that the mixed motive analysis was designed to address: While the remark may show animus, did that animus in fact motivate the adverse employment decision? Again, the question reduces to one about context and tone, issues that are not easily resolved on summary judgment.

The better analysis, and the fairer one here, where there are multiple comments that are either age-related or not, is to take these statements at face value. Vesprini's age was not easily ignored. It was

closely tied to the complex questions about the relationship of the former owners of the business to his successors. The single-motive paradigm does not apply. Age was clearly in the "mix" of the motives animating Shaw's decisions; the pivotal question is whether it was determinative.

### b. *Would the Same Decisions Have Been Made Regardless of Vesprini's Age?*

Shaw's primary explanation for Vesprini's termination focuses on the "profanity-laced tirade" incident in October 1999, coupled with the complaints it received from employees concerning Vesprini. Although Vesprini did testify at his deposition that he recalled this incident somewhat differently than did the defendants, he also admitted that he was "quite furious" and "lost his cool" and didn't exactly remember what he said to whom. He certainly does not dispute that the incident occurred, that he got very angry and lost self-control, or that Ritzel and Houston found it unacceptable. In other words, as Vesprini himself acknowledged outright, there can be little question as to the tenor and flavor, if not to the exact words, of the incident in question, and as to Vesprini's posture in that incident.

It seems clear that this incident, coupled with the complaints [22] of employees about Vesprini's disruptiveness (which stand in much closer temporal proximity to Vesprini's termination than do the remarks described above), offers a complete and non-age-related justification for the actions taken against Vesprini.

The record also reveals another non-discriminatory reason for Vesprini's termination, even aside from the October 1999 incident. It is uncontested from the facts in the record that Shaw had a different long-range vision of how it would handle and develop Circle Floors, and the rest of its New England flooring business, from Vesprini's. Vesprini himself testified that he often disagreed, vocally, with business decisions Shaw made about Circle and how it would be run. (This history of conflict also suggests an alternative meaning for the comments about "taking it easy" and "smelling the flowers"—in other words, these may well have been suggestions that Vesprini should back off, but again for reasons not to do with age—rather, because he kept butting heads with the Shaw executives who were now in charge of the long-range planning for Circle Floors.)

Thus, standing back and viewing the record in its entirety, I find that Shaw has met its burden under the mixed-motive standard, even with all permissible inferences drawn in Vesprini's favor. Had a younger man behaved in the way Vesprini did, under the terms of his employment contract and the Standards of Ethical Conduct Agreement, Shaw would have had valid grounds for terminating him.

### c. *A note on pretext analysis*

Although I find here that Vesprini has adduced direct evidence of discrimination, and was therefore entitled to proceed under the mixed-motive paradigm, I want to point out that the result would have been no different had I termed the evidence in question "circumstantial" and proceeded under the pretext approach. The parties here agree that Vesprini has met his burden of establishing a prima facie case of discrimination, i.e., proving that he (1) was at least 40 years of age; (2) met the employer's legitimate job performance expectations; (3) experienced adverse employment action; and (4) was replaced by a younger person with roughly equivalent job qualifications. *Reeves,* 530 U.S. at 142,

---

**22.** Although Vesprini questions whether such complaints were ever made, he offers no evidence in the record to suggest that they were not.

120 S.Ct. 2097 (2000); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993).

When a plaintiff successfully establishes a prima facie case of discrimination, the burden of production then shifts to the defendant to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). As the Supreme Court observed in Reeves, "[t]his burden is one of production, not persuasion; it can involve no credibility assessment." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Defendants here argue, correctly, that they have met this burden: they have proffered evidence that Vesprini was discharged "due to [his] profanity laced tirade against two employees and [due to] reports that Plaintiff was creating dissension in the workplace."

Finally, the burden shifts back to Vesprini to attempt to prove that Shaw's proffered nondiscriminatory reason was pretextual or "unworthy of credence." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089, and *St. Mary's Honor Ctr.*, 509 U.S. at 507–08, 113 S.Ct. 2742). A plaintiff's prima facie case of discrimination, combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation, can suffice to sustain liability for intentional discrimination. *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097; *see also, e.g., Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 10 (1st Cir.2000); *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 57 (1st Cir.1999), *cert. denied*, 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000). However, "it is not enough to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 519, 113 S.Ct. 2742) (internal emendations omitted).

Vesprini has failed to meet this final burden. Although the evidence of age-related disparaging remarks is relevant here, and suggests that some bias may have been present, the remarks in and of themselves are not sufficient to carry Vesprini's summary judgment burden of demonstrating pretext. He claims that age-related bias animated his treatment, but offers no evidence to suggest that other employees who engaged in profanity-laced tirades or created dissension in the workplace were treated any differently.

Accordingly, the Defendants' Motion for Summary Judgment is **GRANTED** as to Count I.

### C. *Count II: Breach of Contract*

■ With regard to claims for breach of contract, "[c]hoice of law ... provisions are routinely enforced in the Commonwealth, if enforcement is fair and reasonable." *Stagecoach Transp., Inc. v. Shuttle, Inc.*, 50 Mass.App.Ct. 812, 817–18, 741 N.E.2d 862 (2001) (citing *Morris v. Watsco, Inc.*, 385 Mass. 672, 674–75, 433 N.E.2d 886 (1982) (court has acknowledged and given effect to the law reasonably chosen by the parties to govern their rights under contracts)); *see also Lambert v. Kysar*, 983 F.2d 1110, 1118 (1st Cir. 1993) (Massachusetts courts "routinely enforce choice-of-law provisions unless the law chosen violates established public policy or bears no reasonable relationship to the contractual transaction between the parties").

Here, the Employment Agreement between Vesprini and Shaw specifies that it is to be interpreted "according to the laws of the State of Georgia." Moreover, as the

defendants point out, Shaw has its principal place of business in Georgia, the agreement was signed by the parties in Georgia, and the state of Georgia bears a reasonable relationship to the contractual transaction at issue here. Accordingly, I will assess Vesprini's breach of contract claim with reference to Georgia law.

■ Under Georgia law, "an action at law lies for breach of a contract and [ ] damages are given as compensation for the injuries sustained. The elements of a right to recover for a breach of contract are the breach and the resultant damages to the party who has the right to complain about the contract being broken." *Budget Rent–A–Car of Atlanta, Inc. v. Webb,* 220 Ga.App. 278, 279, 469 S.E.2d 712 (1996). As to damages, the Georgia courts have held as follows:

> Damages growing out of a breach of contract, in order to form a basis of recovery, must be such as could be traced solely to the breach, be capable of exact computation, must have arisen according to the usual course of things, and be such as the parties contemplated as a probable result of such breach. The measure of damages in such case is the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it entailed. . . . If the damages are only the imaginary or possible result of the tortious act, or other and contingent circumstances preponderate largely in causing the injurious effect, such damages are too remote

to be the basis of the recovery against the wrongdoer.

*Lankford v. Trust Co. Bank,* 141 Ga.App. 639, 641, 234 S.E.2d 179 (1977) (citing *Crawford & Associates v. Groves–Keen, Inc.,* 127 Ga.App. 646, 650, 194 S.E.2d 499 (1972)); *see also* Ga. Jur. Employment and Labor § 5:4 (1995).

■ Viewed in light of Georgia law on breach of contract, I find that the record before me fails to generate a genuine issue of material fact as to whether Shaw breached its Employment Agreement with Vesprini.

To begin with the areas of unanimity, the parties all agree that (1) the Employment Agreement provided that Vesprini could be terminated[23] prior to the three-year term of the contract, with or without good cause; (2) if Vesprini were to be terminated without good cause, the contract provided that Shaw would pay Vesprini his salary through the end of the contract term; and (3) Shaw did in fact pay Vesprini his salary through the expiration of his employment contract in April 2000. Accordingly, it is crystal clear that Vesprini cannot maintain a breach of contract claim based on his termination per se.

Instead, Vesprini argues that Shaw breached the contract by paying him only $32,000 in bonuses for the three-year term of his contract, whereas he estimates that if he had continued to run Circle Floors in the way he wanted to, he would have made at least several hundred thousand dollars in bonuses. This argument is without

---

**23.** There is some ambiguity, at least technically, as to whether Vesprini was actually "terminated" in November 1999. Vesprini maintains that he was terminated, calling the defendants' position to the contrary "disingenuous"; *see* Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 9. The November 11 letter from Houston, on its face, seems to contemplate ongoing "duties" for Vesprini, but these duties are quite negligible, and the parties do not dispute that Vesprini never came into the office again, was in fact barred from doing so, and his services were never again requested in any form through the expiration of his Employment Agreement in April 2000. For the purposes of considering Shaw's Motion for Summary Judgment I will proceed on the assumption that Vesprini was effectively terminated from his position in November 1999.

merit and profoundly speculative. First, insofar as Vesprini was in fact terminated in November 1999, the contract provides that, in the event of termination without good cause, Vesprini was not entitled to any bonuses for the year in which he was terminated. Second, even if Vesprini was not officially "terminated" in 1999, he would not have been entitled to a bonus for that year anyway, because Circle's 1999 pre-tax income was below the minimum level required for an incentive bonus to be distributed according to the Bonus Agreement. Likewise, the parties do not dispute that in 1997, Vesprini, as the president of Circle Floors, did in fact distribute the bonuses himself and chose not to allocate any bonus money to himself.

The sole remaining bonus issue, then, remains that of the 1998 bonus allocation. In 1998, the bonus pool totaled $156,539; the allocation of the bonuses was done by someone other than Vesprini, but the parties do not dispute that Vesprini received a $32,000 bonus for 1998. At his deposition, Vesprini testified that, although the amount of his 1998 bonus seemed small to him relative to bonuses of years past, he knew that Circle Floors was not doing as well financially as it had been in the past;

he also testified that he did not disagree with the amount allocated to him and that he did not know whether he would have allocated the bonus pool any differently himself.

Particularly in light of the standards set forth in Georgia law, it is clear that Vesprini cannot sustain a claim for damages based on the 1998 bonus allocation. Insofar as the bonus level may have been less than Vesprini was expecting or hoping for, Vesprini himself realized that the discrepancy is more likely to have resulted from Circle Floors's poorer financial performance in 1998 than from the fact that he himself did not do the allocation. Thus, on a very basic level, Vesprini has not introduced evidence sufficient to prove, or even suggest, that the damages he alleges he suffered flowed from the breach of contract rather than from other factors such as Circle Floors' reduced income and/or changes in the market. *See Lankford,* 141 Ga.App. at 641, 234 S.E.2d 179 (damages must be "such as could be traced solely to the breach"). Moreover, all aspects of Vesprini's damages claims run afoul of the requirement articulated in *Lankford* that the amount of the damages be "capable of exact computation"; [24] it is utterly unclear

---

24. In any case, Vesprini's bonus claims are exceedingly speculative. He claims that when he owned Circle Floors, he received annual incentive bonuses on the order of several hundred thousand dollars. In the first year after the Shaw sale in 1997, Vesprini got nothing—but that was his decision, not Shaw's. He decided, for the sake of company morale, to distribute the entire bonus pool to other employees. In 1998, the bonus allocation, made by someone other than Vesprini, resulted in a $32,000 bonus for Vesprini. Vesprini testified that he did not know whether he would have allocated the bonus pool any differently, because he was never told how large the total pool was. In any event, he agrees with Shaw that bonuses declined because of the poor economic performance by SCFS that year. For the years 1999 and 2000, Vesprini received no bonus, he claims, because he was prevented from earning any

incentive bonus when defendant stripped him of all authority and ordered him off the premises. Indeed, he claims that he was somehow entitled to the difference between the $32,000 in bonuses he earned under the three years of his employment contract with Shaw and the approximately $623,000 in bonuses he had earned during the twenty-seven months prior to the sale—as Vesprini described it at his deposition, "the bonuses I think that I would have incurred had I been able to run the company the way I was supposed to have been involved in it."

Vesprini's position on the bonus issue requires several extraordinary leaps of faith, at least on this record: that if Vesprini had not been "stripped of authority," he would have continued to work for the company at the same level he had in the past; that his efforts would somehow have lifted the merged com-

how much the company would have made, how large the bonus pool would have been, and what percentage of that pool would have gone to Vesprini, had the company been run differently in 1997–1999.[25]

Thus, in light of the fact that Vesprini was paid his salary in full, retained all other health and pension benefits, and received bonuses consistent with the terms of his Employment Agreement up through the expiration of that agreement in April 2000, I cannot find any remaining issue of material fact with regard to breach of contract that warrants a trial. Accordingly, Defendants' Motion for Summary Judgment is hereby GRANTED as to Count II of the Complaint.

### D. Count III: Constructive Discharge

■ In *GTE Products Corp. v. Stewart,* the SJC explained the concept of constructive discharge as follows:

> A constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, "I quit," the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation.

*GTE Prods.,* 421 Mass. 22, 34, 653 N.E.2d 161 (1995) (internal quotation marks omitted). As the Massachusetts Appeals Court has observed, the kind of employer conduct that can constitute grounds for constructive termination falls into two broad categories: "one that focuses on demotions and other loss of authority or status in executive and managerial positions, ... and another that focuses on claims of intolerable working conditions." *Rubin v. Household Commercial Fin. Servs., Inc.,* 51 Mass.App.Ct. 432, 441, 746 N.E.2d 1018 (2001); *see also Miller v. Winshall,* 9 Mass.App.Ct. 312, 318, 400 N.E.2d 1306 (1980) ("If an employee, especially an executive employee, is engaged to fill a particular position, any material reduction in rank constitutes a breach of the employment agreement and is tantamount to a discharge, unless the employment contract, by its terms, contemplates a change in the rank and nature of the job."). However, a blow to the employee's pride or prestige associated with a change in duties, standing alone, is insufficient to sustain a constructive discharge claim. *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119–20 (1st Cir.1977).

■ There are at least two major problems with Vesprini's constructive discharge claim. First and foremost, Vesprini never resigned. Shaw asked for his resignation in November 1999, but he refused to sign anything; the letter of November 11, 1999 outlined Vesprini's duties through the expiration of the Employment

---

panies out of the economic problems of 1998; and that his efforts would have produced a record for SCFS equivalent to that Vesprini had accomplished years before, when he was running Circle Floors alone. The record in this case contains little to no evidence to support these inferences.

25. Insofar as Vesprini may be arguing that the actions Shaw took prior to his termination, but not including the actual termination, constitute separate grounds for breach of contract, the *Lankford* rationale contributes to the defeat of these claims as well. In other words, Vesprini appears to be arguing that Shaw breached its contract with him not just by actually firing him, but by stripping him of his authority to run the company as he wanted to. Aside from the fact that the contract itself specified, on its face, that the power to assign Vesprini's work tasks resided with Shaw/Circle, when it comes to the required element of damages, this argument becomes highly speculative and intertwined with other factors that contributed to the smaller bonus pools for 1997–1998 and the nonexistent one for 1999.

Agreement, and Vesprini has introduced *no* evidence to suggest that he ever responded to that letter, indicated in any way that he was officially resigning his position, or expressed his unwillingness to be available to the company on the bases outlined in the letter. In fact, as discussed above, Vesprini argues precisely that he was *terminated* from his position at Circle, and not that he either resigned or was kept on in a meaningful way. Thus, as the First Circuit has explained, "[a] claim of constructive discharge due to a demotion or transfer cannot succeed when a claimant, in fact, has not left employment." *Pedro–Cos v. Contreras*, 976 F.2d 83, 85 (1st Cir.1992).

■ Second, as the case law explains, the effect of a finding of constructive discharge, particularly where there is an express, written employment contract, is to treat the employee's resignation as a termination and therefore to assess it with reference to the contract. *GTE Prods.*, 421 Mass. at 34, 653 N.E.2d 161; *Miller*, 9 Mass.App.Ct. at 318, 400 N.E.2d 1306; *Alicea Rosado*, 562 F.2d at 119. Thus, even assuming, *arguendo*, that Vesprini *was* a victim of constructive discharge, the result would be to treat his resignation like a termination and allow him to collect contractual damages. For the reasons already discussed above, there are no such damages for Vesprini to collect here.

Thus, because the record here lacks a crucial element to sustain a constructive discharge claim—the employee's resignation—and because the remedy would in any case be subsumed within the breach of contract analysis above, Defendants' Motion for Summary Judgment is hereby **GRANTED** as to Count III of the Complaint.

## III. *CONCLUSION*

There can be little question that Vesprini's experience in selling Circle Floors, the business he started from scratch more than forty years ago, to Shaw, and subsequently trying to continue in the same position he held before the sale, did not turn out the way he expected. I have no doubt that it was a difficult, painful, and humiliating process for him to find himself marginalized at Circle Floors, and by this decision I do not in any way mean to make light of his suffering.

However, not all forms of indignity and suffering are cognizable at law. The purpose of the federal and state antidiscrimination laws and the doctrines of breach of contract and constructive discharge is not to provide a remedy at law for seller's remorse: The statutes are targeted at particular forms of discrimination, breach of contract at upholding promises made and bargained for by consenting parties, and constructive discharge at providing a remedy for people whose employers deliberately make their lives so miserable that they are forced to resign their positions. Vesprini's grievances, unfortunately for him, do not fit into any of these categories.

Accordingly, for the foregoing reasons, Defendants' Motion for Summary Judgment [docket entry # 29] is hereby **GRANTED** as to all counts of the Complaint.

**SO ORDERED.**